2003 WY 37

Jennifer Lynn MEADOWS,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Charles David Furman, Appellant
(Defendant),

v.

The State of Wyoming, Appellee
(Plaintiff).

Nos. 01–241, 01–242.

Supreme Court of Wyoming.

March 13, 2003.

Mary Guthrie, Cheyenne, Wyoming, Representing Appellant Jennifer Lynn Meadows.

Kenneth M. Koski, State Public Defender; Donna Domonkos, Appellate Counsel; Diane E. Courselle, Director, Defender Aid Program; and Tracy Lynn Stewart, Student Intern., Representing Appellant Charles David Furman. Argument presented by Ms. Courselle.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and T. Alan Elrod, Assistant Attorney General, Representing Appellee. Argument presented by Mr. Elrod.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Charles David Furman (Furman) and Jennifer Lynn Meadows (Meadows) (collectively Appellants) each entered conditional guilty pleas pursuant to W.R.Cr.P. 11(a)(2) to one count of knowingly or intentionally possessing a controlled substance in excess of three grams in violation of Wyo. Stat. Ann. § 35–7–1031(c) (LexisNexis 2001), a felony pursuant to § 35–7–1031(c)(ii). Appellants' guilty pleas were conditioned on this appeal of the district court's denial of their motions to suppress.

[¶ 2] We affirm.

## ISSUES

[¶ 3] In Case Number 01–242, Furman presents a single issue for review:

The continued detention of Charles Furman exceeded the scope of a permissible *Terry* stop which tainted the subsequent consent to search; hence, any evidence recovered was the "fruit of a poisonous tree" and should have been suppressed.

In Case Number 01–241, Meadows offers two issues for consideration:

I. Whether the trial court erred in denying Meadows' motion to suppress inculpatory evidence which was seized when the lawful scope of the traffic stop was exceeded.

II. Whether the trial court erred in denying Meadows' motion to suppress inculpatory evidence because consent to search the automobile was not voluntarily given.

The State's statement of the issue is substantially identical in each case:

Did the district court properly deny Appellant's motion to suppress evidence resulting from the consensual search of the vehicle he (she) was driving (riding)?

## FACTS[1]

[¶ 4] On July 25, 2001, Wyoming Highway Patrolman Earl Gill stopped a vehicle on Interstate 90 near Moorcroft, Wyoming for going 100 M.P.H. in a 75 M.P.H. zone. Furman was driving and Meadows was a passenger in the vehicle. Furman identified himself as Peter Benjamin Maxwell but could not produce a driver's license or any other form of identification, vehicle registration, or proof of insurance. Initially, Furman told the trooper he had identification in the back of the vehicle. After the trooper told Furman that he could wait while the identification was retrieved, Furman claimed he had left his wallet in Montana at his girlfriend's sister's home. Later, Furman indicated that the Montana police had taken his license after issuing him a speeding citation. Indeed, the only information regarding his identity that Furman provided to the trooper was a Montana speeding citation in the name of Peter Benjamin Maxwell, issued four days earlier.

[¶ 5] Furman told the trooper that the car belonged to his brother, Philip Albright. Dispatch was able to confirm that the car was registered to a Philip Albright in Goldbar, Washington.[2]

[¶ 6] After dispatch could not confirm the existence of a driver's license in Montana for a Peter Benjamin Maxwell, the trooper had Furman write his name, date of birth, and address on a piece of paper as it appeared on his license. On the paper, Furman indicated an Auburn, Washington address. Dispatch initially was unable to locate a Washington license with the information provided by Furman. Trooper Gill informed him that without computer verification of his identity, Furman would have to provide a $200 cash bond for his speeding ticket. Furman indicated that he did not have that much cash and did not have an ATM card so he could not access any cash either.

[¶ 7] By this time, Wyoming Highway Patrol Trooper Hunt had arrived on the scene and after obtaining identification from Meadows, the troopers retired to Gill's patrol car. The officers concluded that Meadows had provided false identification because the photograph bore no resemblance to her at all.

[¶ 8] Dispatch was ultimately able to locate the record of a Peter Benjamin Maxwell whose license, however, listed a Seattle, not an Auburn, address. When Trooper Gill approached him about the address discrepancy, Furman stated that he had lived in Seattle but now resided in Auburn and indicated that he did not know which address was actually on his license. However, when asked about his former residence in Seattle, Furman gave a different street address than that appearing on the Washington license.

[¶ 9] The two troopers then separately questioned Furman and Meadows about their travel plans. Furman indicated that they were on their way from Washington to his father's funeral in Ohio after stopping in Montana to see Meadows' sister. Meadows confirmed that they were going to Ohio for a funeral and also said that they planned to

---

1. The facts are derived from the transcript of the hearing on the Appellants' motion to suppress and the videotape of the stop.

2. The record does not disclose whether there was ever any confirmation that Albright was, in fact, Furman's brother. However, there is confirmation that Albright had given Furman and Meadows permission to use his vehicle.

stop in Oshkosh [3] on the way. When asked if they planned to stop anywhere on the way to Ohio, Furman replied, "No." The troopers had dispatch attempt to contact the sister in Montana through a telephone number given by Appellants. No one was present at the number but an answering machine stated that the number was for a pawnshop.

[¶ 10] Trooper Gill proceeded to issue Furman three citations. He asked if there were any drugs, weapons, or large sums of currency in the car. Furman denied the presence of any of those items. Trooper Gill then asked if he could search the vehicle. Furman asked if he would be taken to jail if he refused. Trooper Gill said, "No," and Furman then denied permission. In response, Trooper Gill informed Furman that before he could leave, a canine unit was going to be brought to the scene. While the trooper returned to his patrol vehicle, Furman leaned into his car and appeared to have a brief conversation with the passenger. Furman then approached Trooper Gill and gave his consent for a search of the vehicle. The search disclosed the presence of various items in the vehicle's trunk consistent with the manufacturing of methamphetamine. Accordingly, Furman and Meadows were arrested.

[¶ 11] Separate Informations were filed against Furman and Meadows charging each of them with one count of misdemeanor interference with a peace officer in violation of Wyo. Stat. Ann. § 6–5–204(a) (LexisNexis 2001) and one count of either knowingly possessing a List I or II controlled substance precursor with the intent to engage in a clandestine laboratory operation in violation of Wyo. Stat. Ann. § 35–7–1059(a)(i) (LexisNexis 2001) or conspiring with or aiding another to engage in a clandestine laboratory operation in violation of § 35–7–1059(a)(iv).

[¶ 12] Furman and Meadows each filed a motion to suppress the evidence found in their vehicle. They contended that Trooper Gill did not have a reasonable suspicion of illegal activity or probable cause to detain them after the traffic citations were issued, and that Furman's consent to search the

vehicle was not voluntary. After a hearing on the motions, the district court issued an order denying them. The court concluded that there were reasonable, articulable suspicions for the continued detention of the Appellants after the completion of the traffic citation process. The district court cited the complete lack of identification by the driver, and for the vehicle, coupled with the obvious heavy load in the trunk, Furman's inability to provide a coherent account of where he lived, Furman's nervousness, and the conflicting statements from Furman and Meadows about their destination.

[¶ 13] The Appellants subsequently entered into a plea agreement whereby they pleaded guilty to one count of knowingly or intentionally possessing a controlled substance in excess of three grams in violation of Wyo. Stat. Ann. § 35–7–1031(c)(ii) in exchange for the State dropping the other charges against them. Appellants' guilty pleas were conditioned on this appeal of the district court's denial of their motions to suppress.

## STANDARD OF REVIEW

[¶ 14] We have reiterated our standard for reviewing a trial court's ruling on a motion to suppress numerous times:

We generally do not disturb evidentiary rulings made by a trial court unless the trial court abused its discretion. *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994). In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. *Gehnert v. State*, 956 P.2d 359, 361 (Wyo.1998). We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions." *Id.* The constitutionality of a particular search or seizure is, however, a question of law that we

---

**3.** Meadows never explicitly identified a state. The State presumes she meant Oshkosh, Wisconsin although there is an Oshkosh in Nebraska too.

review *de novo.* *Id., Jones v. State,* 902 P.2d 686, 690 (Wyo.1995).

*Putnam v. State,* 995 P.2d 632, 635 (Wyo. 2000) (quoting *Burgos–Seberos v. State,* 969 P.2d 1131, 1133 (Wyo.1998)).

[¶ 15] Prior to our discussion of Appellants' claims, we must address an issue raised by Furman relating to our standard for reviewing the videotape of the traffic stop. In addition to the testimony of Trooper Gill at the suppression hearing, the district court also reviewed the videotape of the stop, which was recorded from a camera inside the trooper's patrol vehicle. The district court's ultimate decision denying the motions to suppress was based upon its review of that videotape in conjunction with the testimony from the hearing.

[¶ 16] On appeal, Furman contends that we should review the videotape *de novo* since the credibility of Trooper Gill is not directly at issue through such a review. He suggests that if the videotape conflicts with the trooper's testimony or any of the trial court's findings, then this Court should "independently assess the weight and credibility that should be given to each" piece of evidence. Furman cites *State v. Binette,* 33 S.W.3d 215 (Tenn.2000) in support of the use of a *de novo* standard of review. However, the Kansas Court of Appeals has pointed out the flaw of relying on that case:

> Freel cites *State v. Binette,* 33 S.W.3d 215 (Tenn.2000) to support his assertion that this court should use a de novo standard of review in evaluating the trial court's refusal to suppress the evidence. In *Binette,* the review was de novo because the arresting officer did not testify at trial; however, there was a videotape of the incident. The Tennessee Supreme Court held that when a court's findings of fact at a suppression hearing are based solely on evidence that does not involve issues of credibility, such as a videotape, the rationale underlying a deferential standard of review is not implicated. Thus, a de novo standard of review was found to be appropriate; however, this holding was expressly limited to the facts presented. 33 S.W.3d at 217.

The facts in the instant case differ from *Binette.* Here, the evidence included the videotape and the officers' testimony; therefore, we turn to the established standard of review for the suppression of evidence.

*State v. Freel,* 29 Kan.App.2d 852, 32 P.3d 1219, 1223 (2001). Similarly, in this case, we have the testimony of the officer in addition to the videotape. Accordingly, we will apply our established standard of review as noted above.

## DISCUSSION

*Investigatory Detention*

[¶ 17] An investigatory or *Terry* stop represents a seizure which implicates the Fourth Amendment, requiring the presence of specific, articulable facts and rational inferences giving rise to a reasonable suspicion that a person has committed or may be committing a crime. *Wilson v. State,* 874 P.2d 215, 219–220 (Wyo.1994) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999). There is a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first instance. *Wilson,* 874 P.2d at 223 (quoting *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985) and *Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879). The conduct of an officer is judged by an objective standard which takes into account the totality of the circumstances. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *United States v. Lang,* 81 F.3d 955, 965 (10th Cir.1996).

*Putnam,* 995 P.2d at 637. Appellants concede the validity of the initial stop. Their focus is on the detention subsequent to the issuance of the traffic citations.

[¶ 18]   Once the initial reason for a stop has been resolved, an officer must have specific, articulable facts and rational inferences giving rise to a reasonable suspicion that another crime has been or is being committed to justify a continued detention. *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir.1996). Appellants contend that the district court erred in concluding that Trooper Gill had specific, articulable facts supporting a reasonable suspicion justifying their continued detention after the traffic citations were issued. Initially, Appellants take issue with the court's conclusion that there was a "total lack of identification" on Furman and the vehicle. They note that dispatch confirmed a Washington driver's license in the name given by Furman and that the car was owned by the person identified by him. Appellants insist that the confirmation by dispatch was sufficient to dispel any suspicions. They also claim that Furman did not have trouble telling Trooper Gill where he lived he consistently indicated that he resided in Auburn, Washington and that the officer was merely confused because the address on the driver's license identified by dispatch was an old one. Appellants attack the relevance and weight of the officer's observations that their car's trunk appeared to be weighted down by pointing out that they were on a long distance trip, so it was reasonable to assume that the weighted trunk was the byproduct of their luggage. Accordingly, they contend that the court should have given the officer's observations little, if any, weight. They also insist that they offered substantially similar descriptions of their destination, and that Trooper Gill failed to ask any clarifying questions to resolve the apparent minor discrepancies he perceived. Finally, Furman contends that he was not abnormally nervous during the stop and that there is no evidence from the videotape supporting an assertion that he was. Ultimately, Furman concludes that even if the factual conclusions of the district court were correct, they nevertheless did not support a finding of a reasonable suspicion that Appellants were engaged in the trafficking of illegal drugs, and that their detention based on Trooper Gill's decision to call a canine unit was illegal.

[¶ 19]   Our review of the record leads to the conclusion that Trooper Gill possessed reasonable articulable suspicions justifying the continued detention of Furman and Meadows. The following facts may be discerned from the transcript of the suppression hearing and the videotape of the traffic stop: (1) The driver of the vehicle, Furman, did not possess a driver's license or proof of insurance in violation of Wyoming law (*see* Wyo. Stat. Ann. §§ 31–7–116 and 31–4–103(a) & (b) (LexisNexis 2001)); (2) Furman offered several different explanations about where his wallet containing his driver's license was, varying from the backseat of the car to Meadows' sister's home in Montana to a claim that the Montana police had taken it after issuing him a speeding ticket; (3) The address given by Furman was for an Auburn, Washington residence but the driver's license located by dispatch bore a Seattle, Washington address; (4) Furman indicated that he had lived in Seattle but when asked, gave a different address than that appearing on the driver's license; (5) Meadows proffered a driver's license that the officers believed was not hers because of the substantial physical differences between the photograph on the license and Meadows' appearance; (6) Furman identified the owner of the vehicle as his brother although that person bore a different surname; (7) Furman was ostensibly traveling cross-country, but he was not carrying any cash or an ATM card; (8) Furman and Meadows agreed that they were traveling to Ohio for the funeral of Furman's father but disagreed on their itinerary; (9) the vehicle appeared to be heavily weighted in the trunk area; and (10) Furman appeared to be abnormally nervous, as described by Trooper Gill:

> He seemed basically to try to avoid some of the questions I had asked him. Also I noticed right away he was about four or five times his body movement and his speech was a lot faster than normal. At one point I considered the fact that he was probably taking some type of illegal narcotics because his speech and behavior was just entirely too fast. He was extremely hyper, and that stayed throughout the course of the time I had dealt with him.
> . . . .

There was [*sic*] just a couple times if I would ask him a question, his speech would change. He'd hum a lot. And he could answer me, maybe a question. It was just the way he was doing it. The speech alone was entirely too fast. He was humming, making a lot of gestures, but he wasn't saying either yes, no, giving me a straight answer, I guess.

. . . .

He his behavior was just from the very beginning he was extremely fast in what he was doing. He bounced around too much. His behavior was just a little bit different as compared to when I stop people on the highway and they are nervous because they just got stopped. I've never stopped before, you know, a person who isn't a little bit nervous. But when they're answering questions when I'd ask him questions he stuttered. He bounced around. His behavior was just totally different. It's hard to describe, but he was just moving in a really fast world.

[¶ 20] Each of these facts considered in isolation could be construed as the innocent behavior of cross-country travelers. However, we must look at the circumstances in their entirety and when we do so, factors that could be indicative of innocent behavior, if considered in isolation, may well support a reasonable suspicion of illegal activity when considered in totality. *Putnam*, 995 P.2d at 637. Our review of the record convinces us that the district court's factual conclusions are not clearly erroneous. Contrary to Appellants' assertions, the court correctly noted that there was a "total lack of identification" of the vehicle and the driver, Furman. There was no proof of insurance or registration on the car. While Furman gave the officers a name that dispatch confirmed was the holder of a valid Washington driver's license, he offered no proof that he was, in fact, that person. Meanwhile, Meadows supplied the officers with identification that they concluded was false on its face. Furman gave conflicting accounts of where his identification was and did not identify the address that was listed on the Washington driver's license, nor did he offer an explanation for the discrepancy between it and the addresses

that he did provide. All of these factors support a reasonable suspicion that Furman and Meadows were not who they claimed to be.

[¶ 21] The additional facts noted by the court support the decision to detain Appellants after the traffic citations were issued. Appellants' actions were not consistent with their claim that they were traveling to Ohio for a funeral. The speeding ticket issued to Furman in Montana was dated four days before the stop at issue in this case. Furman acknowledged that he was traveling without cash or access to an ATM card. There were discrepancies between Furman's and Meadows' description of their itinerary. Meadows claimed that they planned to stop in Oshkosh before proceeding to Ohio, while Furman insisted that they were traveling straight through. These facts combined with the weighted trunk and Furman's abnormal nervousness give rise to a reasonable suspicion that they had committed or were committing a crime. Trooper Gill testified that among the factors they consider to determine if there is the possibility of drug trafficking are: (1) a lack of identification on the vehicle occupants including either driver's licenses or credit cards; (2) no identification on the vehicle outside of the VIN number; (3) the demeanor of the occupants; and (4) discrepancies among the occupants regarding their destination. Courts have found similar factors sufficient to support the continued detention of a vehicle's occupants in order to investigate possible drug trafficking. *See United States v. Zubia–Melendez*, 263 F.3d 1155 (10th Cir.2001) (Driver could not produce identification or vehicle registration and occupants gave conflicting accounts of their travels justifying detention pending a canine search.); *see also United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir.1995); *United States v. Finke*, 85 F.3d 1275 (7th Cir.1996). Confronted with the lack of evidence of Furman's identification and his authority to use the vehicle, Trooper Gill was justified in asking questions about the identity and travel plans of him and his passenger. *Zubia–Melendez*, 263 F.3d at 1161. Based upon the dubious and inconsistent answers to his questions regarding their identification and travel plans coupled with Furman's nervousness

and the weighted trunk, Trooper Gill was justified in detaining Appellants for further investigation.[4]

### Consent to Search Vehicle

[¶ 22] In their second issue, Appellants allege that Furman's consent to search the vehicle was not voluntary.[5] Appellants contend that Trooper Gill created an atmosphere that effectively coerced Furman's consent to search the vehicle. Appellants point to various comments appearing on the videotape made between Trooper Gill and Trooper Hunt while they were seated in Gill's patrol car. These comments included a statement from Trooper Gill that he would "bet" a soda that he could get Furman to allow a search of his vehicle. Furman also alleges that after he had initially refused to allow a search after receiving the traffic citations, Trooper Gill had informed him that a canine unit was on the way to the scene when, in fact, no unit had been called. Furman claims that Trooper Gill lied about the canine unit as part of the process to coerce consent from him. Furman supports his claim of a coercive atmosphere by citing the repeated questioning of him regarding his identity and travel plans and the Trooper's disregard of his answers or his failure to ask appropriate clarifying questions. Accordingly, Appellants claim that, under the totality of the circumstances, the consent to search the vehicle was not voluntary.

[¶ 23] The question of whether or not consent to search a vehicle was voluntary must be determined under the totality of the circumstances. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235–37, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

We have framed the standard of review as follows:

> Subject to certain exceptions, warrantless searches and seizures are per se unreasonable under both the Fourth Amendment to the United States Constitution and Article 1, Section 4 of the Wyoming Constitution. *Gronski v. State*, 910 P.2d 561, 564 (Wyo.1996). Among the recognized exceptions are searches and/or seizures conducted pursuant to a valid consent. *Id.* "Whether an exception exists in a particular case is a question of fact that may be properly resolved by a preponderance of the evidence standard in the light of all attendant circumstances." *City of Laramie v. Hysong*, 808 P.2d 199, 203 (Wyo. 1991). When this Court reviews questions of fact, we view the evidence in the light most favorable to the prevailing party. *Id.* The burden of proving that the circumstances of a particular case fit within an exception is with the State. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970).

*Gehnert v. State*, 956 P.2d 359, 362 (Wyo. 1998).

[¶ 24] The record does not support the contentions made by Appellants. First, they fail to explain how the comments made between Troopers Gill and Hunt had any reasonable effect upon Furman's consent. While the comments may have been questionable on a professional level, they were made outside of Appellants' presence and could have had no discernible effect on Furman's decision at the time it was made. Second, the questions posed by Trooper Gill were a reasonable response to Appellants' prevarications on their identities and travel plans. Finally, Trooper Gill testified that he told Furman he was going to call the canine unit not that he had already done so. There

---

4. Furman requests that the Court impose a stricter standard under the Wyoming Constitution than that embodied under federal case law to specifically require a connection between the nature of the investigation and the suspicions underlying the reason for a motorist's continued detention. Furman does not provide a cogent argument for why or even what specific criteria would drive such a standard. However, we need not make a specific ruling on this issue since we conclude that there was a sufficient nexus between the specific, articulable facts and the ra-

tional inferences derived therefrom and the investigation into whether or not Appellants were trafficking illegal drugs.

5. To a significant degree, Appellants' argument is predicated on the contention that their detention was illegal. We have held that the detention was justified under the circumstances and, therefore, to that extent Appellants' claim on this point is moot.

is no evidence that the officer was using the prospect of a canine search as a coercive tool to wrest consent from Furman. The State satisfied its burden of demonstrating that the search of the automobile was justified under the consent exception to the warrant requirement, and the district court's denial of Appellants' motions to suppress is affirmed.

## CONCLUSION

[¶ 25] Appellants' detention was based on specific, articulable facts and reasonable inferences derived therefrom that formed a reasonable suspicion of criminal activity. The evidence also supports a conclusion that Furman's consent to search the vehicle was given voluntarily. The district court's denial of the motions to suppress is affirmed.