2005 WY 112

**Jason Leland GOMPF, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–55.

Supreme Court of Wyoming.

Sept. 7, 2005.

Representing Appellant: Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender. Argument by Ms. Yoder.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Dee Morgan, Senior Assistant Attorney General; Eric Johnson, Director, PAP; and Michael Stulken, Student Intern, PAP. Argument by Mr. Stulken.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1]  A jury convicted Jason Gompf of possession of a Schedule I controlled substance, marijuana, with intent to deliver, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2003). Prior to trial, Mr. Gompf filed two motions to suppress the evidence and statements obtained by police during an encounter with him at his place of residence. The district court denied both motions, and Mr. Gompf appeals his conviction claiming the evidence should have been suppressed. Finding no error in the district court's denial of the suppression motions, we affirm Mr. Gompf's conviction.

## ISSUES

[¶ 2] Mr. Gompf presents the following issues for review:

*Issue I*

Whether the trial court erred in denying appellant's motion to suppress evidence.

*Issue II*

Whether the trial court erred in denying appellant's motion to suppress statements.

The State rephrases the issues as follows:

I.   Whether the district court properly denied appellant's motion to suppress the evidence found in his room?

II.  Whether the district court properly denied appellant's motion to suppress the statements he made to law enforcement officers?

## FACTS

[¶ 3] On March 10, 2003, at approximately 12:16 a.m., Officer Daniel Stroup was dispatched to a Gillette motel to interview David Frazier about a stolen handgun. Mr. Frazier told Officer Stroup that he had stolen a Ruger semi-automatic 9 mm handgun from an individual in Sheridan, Wyoming, and it was in the possession of Herb Morgan who lived at 815 E. 5th Street in Gillette. After speaking with Mr. Frazier for approximately 45 minutes, Officer Stroup returned to the police department to "make inquires concerning the handgun."

[¶ 4] Officer Stroup was unable to confirm any report of a stolen handgun matching Mr. Frazier's description. Nevertheless, shortly after 2:00 a.m., Officer Stroup and three other officers [1] drove to 815 E. 5th Street to speak with Mr. Morgan. The home was owned by Peggy VanLitsenborgh, and Mr. Morgan was a tenant in the home. Officer Stroup and Officer Overton knocked on the door after noticing several interior lights were on. Mr. Morgan answered the door and invited the officers inside. The officers explained they had received a report of a stolen handgun and wanted to talk to him about it. Ms. VanLitsenborgh approached

and asked everyone to step outside. Officer Stroup and Officer Carter stepped outside with Mr. Morgan while Officer Overton remained in the entryway with Ms. VanLitsenborgh. Officer Stroup continued to question Mr. Morgan outside, and asked whether the stolen handgun was in the house. Mr. Morgan stated that he had received a handgun from Mr. Frazier, and it was in the basement in a safe.

[¶ 5] The officers and Mr. Morgan reentered the house and Ms. VanLitsenborgh offered to show the officers where the gun was in the basement. She led the officers downstairs, where the officers smelled burnt marijuana and observed Mr. Gompf and Jamie Nelms sitting in chairs in the family room. Ms. VanLitsenborgh showed the officers a .22 caliber semi-automatic pistol. They informed her the gun did not match Mr. Frazier's description of the stolen handgun, but she denied having any other guns in the house.

[¶ 6] The officers then asked the group about the smell of burnt marijuana in the air. Ms. VanLitsenborgh responded that she had a personal stash in her bedroom, which she would surrender. Officer Overton indicated he would have to accompany Ms. VanLitsenborgh to her bedroom to retrieve the marijuana, but she responded that she "didn't feel comfortable [having them] in her house without a warrant." In anticipation of needing a warrant, the officers asked everyone to move upstairs, conducted a protective sweep of the basement "to make sure . . . no other individuals [were] hiding," and secured the occupants in the upstairs living room. Officers Stroup and Overton proceeded to the county attorney's office to apply for a search warrant, which was issued "shortly after 4 a.m." The warrant sought marijuana, packing materials, pipes, bongs, related paraphernalia and the stolen Ruger 9–mm handgun and two clips.

[¶ 7] The officers began the search of the VanLitsenborgh residence at approximately 4:50 a.m. While other officers were searching the basement of the house, Officer Stroup

---

1. The other officers were Officer Tracy Overton, Corporal Kevin McGrath, and Officer Doug Carter.

conversed with Mr. Gompf outside on the front porch. Officer Stroup asked about the handgun and then inquired whether there were any drugs in the house. Mr. Gompf informed him that one quarter ounce of marijuana could be found in his bedroom.

[¶ 8] During the search, the officers discovered marijuana, pay-owe sheets,[2] a scale, a live marijuana plant, and paraphernalia in Mr. Gompf's bedroom. Corporal McGrath told Mr. Gompf about the items they found in his bedroom and asked him if he was a drug dealer. Mr. Gompf initially denied selling drugs, claiming they were only for his personal use. He subsequently admitted he sold drugs to his friends.

[¶ 9] The discovery of the drugs and paraphernalia caused the officers to apply for a second warrant to further search the residence, Mr. Gompf's car, and all persons in the house. The second warrant was issued at 8:45 a.m. When the officers returned to the scene with the second warrant, Detective Paige Wells and day shift personnel arrived. Detective Wells was briefed on the situation, surveyed the evidence found up to that point, and interviewed those present, including Mr. Gompf, individually in an upstairs bedroom. At the suppression hearing, Detective Wells testified that, before beginning her interview of Mr. Gompf, she informed him of his constitutional rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but she admitted that she recited the rights without the aid of a *Miranda* card. According to Detective Wells, Mr. Gompf indicated he understood his rights. However, Mr. Gompf denied receiving any *Miranda* warnings.

[¶ 10] Detective Wells testified that she then asked Mr. Gompf a series of questions and learned he had lived at the residence for about one year. Mr. Gompf admitted that the marijuana, including the plant, and the pay-owe sheets belonged to him. Nevertheless, he denied selling marijuana, claiming he used it himself and "gave" it to his friends. Mr. Gompf refused to provide Detective Wells with any of his friends' names. The interview lasted approximately 15 minutes, after which Detective Wells arrested Mr.

Gompf and transported him to the Campbell County Detention Center.

[¶ 11] Mr. Gompf was charged with possession of a Schedule I controlled substance with intent to deliver, in violation of § 35-7-1031(a)(ii) and entered a plea of not guilty. Prior to trial, Mr. Gompf filed a motion to suppress all evidence obtained during the searches. Mr. Gompf's motion included three bases for suppression: 1) the officers did not have "reasonable cause" to come to his home in the middle of the night; 2) the warrants were invalid because they did not include the affidavits for the search warrants; and 3) the officers improperly executed the second warrant at 4:50 a.m. when it required execution during daytime hours. At the suppression hearing, Mr. Gompf withdrew the third basis for his motion and limited his argument to the first two issues. At the conclusion of the hearing, the district court orally denied the motion to suppress the searches "based on the testimony . . . and the examination of the warrants."

[¶ 12] Mr. Gompf filed a second motion, seeking suppression of the statements he made while he was "detained by or in the custody of Gillette Police Department officers on March 11, 2003, at 815 E. 5th St., Gillette, Wyoming," as well as all evidence obtained as the fruit of his statements. The district court held a hearing and, subsequently, denied that motion as well.

[¶ 13] A jury found Mr. Gompf guilty of possession of marijuana with intent to deliver, and the district court sentenced him to three to five years in the Wyoming State Penitentiary and fined him $10,000. The court suspended the sentence of incarceration and $5,000.00 of the fine and instead ordered him to spend one year in the Campbell County Detention Center followed by six years of probation. This appeal followed.

## STANDARD OF REVIEW

[¶ 14] We review a district court's legal ruling on a motion to suppress evidence *de novo*, giving deference to the trial court's findings of fact, unless they are clearly erro-

---

2. Pay-owe sheets record names of marijuana buyers and how much they owe their dealer.

neous. *Hannon v. State,* 2004 WY 8, ¶ 12, 84 P.3d 320, 328 (Wyo.2004); *Gunn v. State,* 2003 WY 24, ¶ 5, 64 P.3d 716, 719 (Wyo.2003). This Court considers the evidence in the light most favorable to the district court's decision because that court is in the best position to "assess the witnesses' credibility and make the necessary inferences, deductions, and conclusions therefrom." *Meek v. State,* 2002 WY 1, ¶ 8, 37 P.3d 1279, 1282 (Wyo.2002) (citation omitted). The constitutionality of a particular search or seizure is a question of law which we review *de novo. Id.*

## DISCUSSION

### A. *First Motion to Suppress*

[¶ 15] Mr. Gompf contends that the trial court erred in denying his motion to suppress the evidence obtained during the searches of his residence. Mr. Gompf presents a multifaceted argument, claiming that the searches violated his Fourth Amendment rights. He asserts the officers had no right to come to the house unexpectedly to inquire about the stolen gun; the officers exceeded the scope of the occupants' consent when they entered the basement; Ms. VanLitsenborgh lacked the authority to consent to the search of Mr. Gompf's bedroom; and no exigent circumstances existed to search the residence. With the exception of his first contention—the officers did not have "reasonable cause" to come to his house to question him—these arguments are raised for the first time on appeal.

[¶ 16] In general, a criminal defendant may not raise an argument for the first time on appeal. *Hughes v. State,* 2003 WY 35, ¶ 19, 65 P.3d 378, 384 (Wyo.2003); *Meerscheidt v. State,* 931 P.2d 220, 225 (Wyo. 1997) (citing *Kennedy v. State,* 890 P.2d 37, 38 (Wyo.1995)). "Our rule is that in the absence of fundamental error affecting a substantial right of the appellant an issue raised for the first time on appeal will not be considered." *Belden v. State,* 2003 WY 89, ¶ 55, 73 P.3d 1041, 1090 (Wyo.2003), quoting, *Davis v. State,* 859 P.2d 89, 94 (Wyo.1993). Violation of a defendant's Fourth Amendment protections would, of course, amount to fundamental error.

[¶ 17] The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *State v. Straub,* 749 N.E.2d 593, 597 (Ind.Ct.App.2001) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "[A] home is entitled to special dignity and special sanctity and ... the proper way to search a home is to obtain a search warrant." *Brown v. State,* 738 P.2d 1092, 1094 (Wyo. 1987). Thus, searches and seizures inside a home without a warrant are presumptively unreasonable, but there are a few "well-delineated exceptions to the warrant requirement." *Vassar v. State,* 2004 WY 125, ¶ 19, 99 P.3d 987, 995 (Wyo.2004). Consent and the existence of exigent circumstances are two of the exceptions to the warrant requirement. *Pena v. State,* 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004); *Meadows v. State,* 2003 WY 37, ¶ 24, 65 P.3d 33, 40 (Wyo.2003).

[¶ 18] The appellant has the burden of establishing plain error when the claim is not raised in the district court. *Belden,* ¶ 55. Plain error is: "[t]he violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice." *Id.* See also, *Arevalo v. State,* 939 P.2d 228, 232 (Wyo.1997).

[¶ 19] The limited record in the instant case does not support the Fourth Amendment claims Mr. Gompf raises for the first time on appeal. Ms. VanLitsenborgh clearly had the authority to consent to the officers entering her home, and there is no question that she invited the officers to follow her to

the basement to retrieve the handgun. The area Ms. VanLitsenborgh led the officers to in the basement was a family room which was used as a common area by the occupants of the house and their guests. In fact, Mr. Gompf and another person were sitting in the area when the officers entered.

[¶ 20] Once the officers were lawfully in the basement common area, they smelled burnt marijuana. At this point, the officers had probable cause to justify issuance of the search warrant. Indeed, Mr. Gompf does not claim that the officers lacked probable cause to procure the search warrant. It was pursuant to this warrant that the officers eventually searched Mr. Gompf's bedroom and discovered the drug evidence.[3] Thus, Mr. Gompf's arguments that Ms. VanLitsenborgh did not have the authority to consent to the search of his bedroom or that exigent circumstances did not exist to justify the search of his bedroom are not valid or even relevant under the facts of this case. Because the search was authorized by the warrant, it is unnecessary to consider any exceptions to the warrant requirement. Mr. Gompf obviously cannot establish plain error on the record presented here; consequently, we decline to further consider the issues Mr. Gompf raises for the first time on appeal.

[¶ 21] We turn now to Mr. Gompf's argument that the district court erred by failing to suppress the evidence because the officers had no right to approach the house in the first instance. Our resolution of this issue revolves around the police officers' initial encounter with the occupants of the residence. Mr. Gompf claims the officers conducted a warrantless "search" of the residence in violation of the Fourth Amendment merely by knocking on the door and asking about the handgun. The State contends the initial encounter, commonly known as a "knock and talk," did not violate the Fourth Amendment.

[¶ 22] A "knock and talk" investigation "involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house." *Hayes v. State*, 794 N.E.2d 492, 496 (Ind.Ct.App.2003). The phrase "knock and talk" was apparently first used by an Oregon appellate court in *State v. Land*, 106 Or.App. 131, 806 P.2d 1156 (1991). See generally Swingle & Zoellner, *"Knock and talk" consent searches: If called by a panther, don't anther*, 55 J Mo B 25 (1999). Since then, the use of this new shorthand description for a long-established police investigative technique has become commonplace across the country. *Id.* Nevertheless, this is apparently the first opportunity for the Wyoming Supreme Court to directly consider the "knock and talk" procedure.

[¶ 23] The prevailing rule is that, absent a clear expression by the owner to the contrary, police officers are permitted to approach a dwelling and seek permission to question an occupant in the course of their official business. See *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567, 575 (2002); see also *United States v. Johnson*, 170 F.3d 708, 720 (7th Cir.1999); *United States. v. Jones*, 239 F.3d 716, 720 (5th Cir.2001); *Scott v. State*, 366 Md. 121, 782 A.2d 862, 872–73 (Ct.App. 2001); *People v. Frohriep*, 247 Mich.App. 692, 637 N.W.2d 562, 566 (2001) *Rogers v. Pendleton*, 249 F.3d 279 (4th Cir.2001). There is no requirement that law enforcement have probable cause or reasonable suspicion before they may approach a home and ask for permission to enter. Swingle & Zoellner, *"Knock and talk" supra*, 26. When police utilize a "knock and talk" procedure, whether as a spur of the moment response to an anonymous tip or the final culmination of a long but successful effort to develop probable cause for a search warrant, they are merely asking for permission to search a person's home, recognizing and risking that a refusal would not only alert the suspect that he is being watched but would quite likely

---

3. Mr. Gompf's appellate brief suggests that the officers discovered the drug evidence in Mr. Gompf's bedroom prior to securing the warrant. The State strongly disagrees with Mr. Gompf's reading of the record. Considering the record in the light most favorable to the district court's decision, we must agree with the State and conclude Mr. Gompf's assertion is not supported by the record.

leave the police empty handed. Swingle & Zoellner, *"Knock and talk" supra,* 25.

[¶ 24] Thus, at the heart of the "knock and talk" procedure lies consent, which has long been recognized as one of the many exceptions to the search warrant requirement. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

> Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning.

*Id.* at 231–232, 93 S.Ct. 2041.

[¶ 25] With this discussion in mind, we proceed to apply this law to the instant facts. There can be little doubt that the officer's presence at Ms. VanLitsenborgh's house at 2:00 a.m. was unexpected and surprising. However, there is no evidence that she or her tenants clearly indicated to law enforcement that they were not welcome to approach the front door of the residence. Furthermore, there is no evidence that the officers acted in a manner which would communicate to a reasonable person that he could not refuse their requests. The officers did not brandish their weapons, raise their voices or command the residents to let them into the house. Rather, the record clearly shows the opposite occurred. The lights were on in the house and the officers, therefore, assumed people were awake inside. In addition, the officers did not believe that the gun had been stolen by any of the residents of the home, and, initially, they were not there to investigate any wrongdoing by the occupants of the home. Considering the totality of the circumstances, we hold that no illegal search occurred as a result of the "knock and talk" investigation in this case.

[¶ 26] Mr. Gompf also contends the entire exchange between the police and the occupants of the house was tainted because an unreliable tip from Mr. Frazier directed the officers to the residence in the first place. Mr. Gompf's argument ignores the fact that the officers were not required to have probable cause or even a reasonable suspicion of illegal activity to approach the front door and ask for permission to enter. In the context of the "knock and talk" procedure, the officers were not relying on the informant's tip to procure a warrant or to seize anyone; rather, they were merely investigating evidence of a possible crime, in this case the theft of a handgun. This is not unusual or illegal behavior by law enforcement. *See for example United States v. Bernitt,* 392 F.3d 873 (7th Cir.2004) (acting on an informant's tip that marijuana plants were growing alongside Bernitt's home, [police officers] went to do a "knock and talk" investigation the purpose of which was to gather more information); *United States v. Miller,* 104 Fed.Appx. 591 (8th Cir.2004) (an unidentified caller reported suspected drug dealing and subsequent "knock and talk" to further investigate); *United States v. Carter,* 360 F.3d 1235 (10th Cir.2004) (investigation of a tip regarding possible drug use and stolen property involved officers observing lights on inside the house and knocking on the door to talk). Accordingly, the fact that the officers relied on a possibly unreliable tip is irrelevant to our analysis and did not undermine the officers' right to approach the residence and ask for permission to enter.

### B. Second Motion to Suppress

[¶ 27] In Mr. Gompf's second issue, he claims the district court erred in denying his motion to suppress the statements he made to law enforcement prior to his arrest and the evidence obtained as a result of those statements. He argues his statements to Officer Stroup and Corporal McGrath were taken while he was in custody and the officers violated his constitutional rights by failing to provide a proper warning pursuant to *Miranda.* Mr. Gompf also claims that the district court should have suppressed his statement to Detective Wells because she did not provide an adequate *Miranda* warning and his statement was not voluntary.

[¶ 28] On the night of March 10, 2003, the police officers first encountered Mr. Gompf in the basement of Ms. VanLitsenborgh's house. The occupants of the house were

subsequently asked to move to the upstairs living room while the officers secured a warrant, thereby ensuring that evidence in the house remained intact.

[¶ 29] The first instance of questioning took place when Officer Stroup asked Mr. Gompf to come outside onto the porch while the first warrant was being executed. First, he asked Mr. Gompf "about the possibility of ... there being a gun in the house," and about "the possibility of finding any narcotics." Mr. Gompf replied that there might be a gun in the house, and that approximately one-quarter ounce of marijuana could be found in his bedroom. Officer Stroup further testified that he asked Mr. Gompf "a couple more questions" about the firearm. He did not advise Mr. Gompf of his rights, nor did he place him under arrest or in handcuffs. After their conversation, the two men returned to the living room.

[¶ 30] Later, Corporal McGrath questioned Mr. Gompf when he asked him to accompany him outside while he smoked a cigarette. Once outside, Corporal McGrath told Mr. Gompf what was found during the execution of the first search warrant: "a plant, approximately one pound of marijuana, some paraphernalia, pay-owe sheets, a scale." Mr. Gompf responded immediately that "it was all for personal use." Mr. Gompf also stated that he used the scale so he "didn't get ripped off" and that the pay-owe sheets were used to "keep track of friends" that owed him money. Corporal McGrath testified his conversation with Mr. Gompf lasted "less than five minutes" and he never brandished his weapon, touched Mr. Gompf, or threatened him. Furthermore, Mr. Gompf volunteered a great deal of information to Corporal McGrath without being questioned.

[¶ 31] A suspect is entitled to be warned pursuant to *Miranda* if he is "in custody" when interviewed by the police. *CSC v. State*, 2005 WY 106, ¶¶ 18–19 (Wyo. 2005).

> When the authorities make the proper advisements, statements made by a suspect while in custody are admissible into evidence. The corollary of this rule is that "[s]tatements made during custodial interrogation must be excluded upon a showing

that the defendant was not advised of his *Miranda* rights." Nevertheless, "this Court adheres to the principle that the rights recognized in *Miranda*, including the right to counsel, apply **only** in the context of custodial interrogation." In *Miranda*, the United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

> The determination of whether a suspect is "in custody" when questioned is made by considering the totality of the circumstances of the interrogation. In resolving the custodial status of a suspect we consider "whether a reasonable man in [the suspect's] position would have considered himself to be in police custody."

*Id.* (citations omitted).

[¶ 32] According to the United States Supreme Court, two inquiries are essential to the determination of whether or not a suspect is in custody. In *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Court outlined those inquiries:

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: "was there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Id.* at 112, 116 S.Ct. 457.

[¶ 33] This Court has outlined the numerous factors which may be relevant in determining whether a suspect has been subjected to "custodial interrogation" within the meaning of *Miranda* in *Gunn*, ¶ 7. Among them are: (1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to those associated with a formal arrest; and (4) the duration and char-

acter of the interrogation. *See* Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 6.6(c) at 527 (2nd ed.1999); *see also Wunder v. State,* 705 P.2d 333, 335 (Wyo.1985). Other important factors to consider include the nature of the interrogator, the nature of the suspect, the time and place of the interrogation, the progress of the investigation at the time of the interrogation, whether the suspect is informed that his detention would not be temporary, and the elapsed amount of time between questioning and the arrest. *Id.,* at 335; J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 A.L.R.3d 565 (1970). No one factor alone will necessarily establish custody for *Miranda* purposes, and not all factors are relevant to a given case. *Hannon,* ¶ 42.

[¶ 34] As in most cases where the determinative issue is whether or not a suspect was "in custody" when questioned, there are factors in this case weighing both in favor of the conclusion that the encounters were non-custodial and factors which also could suggest that the encounters were custodial. *CSC,* ¶¶ 18–19. The fact that law enforcement was present in the residence for approximately eight hours and the occupants' movements were somewhat limited supports the suggestion they were "in custody." On the other hand, the officers did not brandish their weapons, tell the occupants they could not leave, or advise them that they were under arrest. The occupants were not handcuffed or physically restrained in any way. Although the occupants of the house were not allowed to use the restroom unaccompanied because the officers were concerned about the possibility evidence could be destroyed, they were not prevented from using the restroom facilities.

[¶ 35] The record clearly shows that the occupants were comfortable during their encounter with law enforcement. In fact, Mr. Gompf slept for a great deal of the time the officers were at the house. Neither Officer Stroup nor Corporal McGrath forced or coerced Mr. Gompf to go outside to visit with him. He was not handcuffed or physically restrained in any manner. The interviews were brief, and Mr. Gompf freely volunteered information. The officers did not tell him he was under arrest, threaten him, or promise anything to him. Thus, looking at the totality of the circumstances, the district court's finding that Mr. Gompf was not in custody when talking to Officer Stroup and Corporal McGrath is supported by the evidence.

[¶ 36] Our conclusion is supported by this Court's rationale in a factually similar case entitled *Southworth v. State,* 913 P.2d 444 (Wyo.1996). In that case, police officers questioned the defendant while executing a search warrant based on a tip of stolen computer equipment. *Id.* at 446. We stated:

> Appellant does not make any claim of coercion, threats, promises, or deception. He had not been physically seized, he was not handcuffed, and no weapons were drawn when he made his remarks. The officers did not give any outward signs that they were restricting Appellant's ability to leave or any indication that Appellant was under arrest. In fact, Appellant was very friendly, polite, and talkative during the entire time that the officers were conducting their search. Additionally, Appellant was in his own home when he offered these statements. The other residents of the mobile home, whom Appellant had lived with on and off for about three and one-half years and whom he thought of as being family, were also present when this questioning took place. *See, e.g., Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (holding that interrogation in the suspect's home was noncustodial); see also 1 WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 6.6(e) (1984) (the view that at-home questioning is noncustodial is strengthened when the suspect's friends or family members are present at the time). Furthermore, even though Appellant had been asked to stay in the living room until the mobile home was secured, he took his dog outside. Upon reentering the mobile home, he followed the officers around as they conduct-

ed their search rather than staying in the living room area as he was asked to do. *Id.*

[¶ 37] In a very brief argument, Mr. Gompf contends the trial court erred in refusing to suppress his statement to Detective Wells because she did not properly advise him of his *Miranda* rights. He also claims that, even if he was properly advised of his rights, the district court erred by refusing to suppress his statements because they were involuntary.

[¶ 38] Detective Wells awakened Mr. Gompf, who was asleep in a recliner, to question him. Detective Wells described her conversation with Mr. Gompf as follows:

DW: I asked him to come in the bedroom. He gets up. We go in the bedroom. We sit on the bed. I tell him I think he's in a lot of trouble, and he kind of shrugs and says, yeah.

We sit on the bed. I tell him that he's going to go to jail, and then I Mirandize him. He doesn't—he tells me that he understands his rights, but when I ask him with those in mind will he speak with me, he just kind of shrugs. So then I ask him—I tell him, I said, I'll ask questions. If you don't want to answer them, you don't have to. And that's how we got into our conversation.

Q: Okay. Describe for the Court the questions you ask and his answer.

DW: First thing I asked him about was did he live in this residence, and he told me that he did. He lived there approximately a year. That one of the bedrooms in the basement was his, and, in fact, the bedroom where we found the one package of marijuana.

I asked him if that marijuana belonged to him, and he said that it did. I asked him about the 4 and a half, 5–foot plant, and he said that was his as well. At this point he's not making any comment about the other four or five bags of marijuana that we found in a kind of a little room off of his room. So I asked him whose marijuana that is, and he says, it's mine.

I think we have some discussion about— Corporal McGrath had mentioned pay-owe

sheets to me. I think I asked if he sells his marijuana. He tells me he does not sell marijuana. He gives it to his friends. I asked him what the numbers and the names are on the pay-owe sheets. He says those are his friends that he gives marijuana to.

I had asked him if he'll give their names, and he says he won't. I asked him if he'll give me the name of who he purchased the marijuana from, and he said he would not. He said he'd comply with me with anything I wanted except people's names who either get marijuana from him or that he gets marijuana from.

At that point we pretty well were through and I had officers take him to the detention center.

Q. Okay. Did you have any further discussions with Mr. Gompf after he was arrested?

DW: No, I did not.

[¶ 39] Detective Wells testified that she recited the *Miranda* warning to Mr. Gompf from memory because she did not have a *Miranda* card on her person. She told him "he had the right to remain silent; that anything he said would and could be used against [him] in a court of law," that "he had [the] right to an attorney and if he could not afford one, one would be appointed for him," and that "once we started talking that he could stop my questioning and not answer any questions if he wanted to." Detective Wells testified that Mr. Gompf indicated that he understood his rights. In contrast, Mr. Gompf testified at the suppression hearing that the detective did not advise him of his *Miranda* rights.

[¶ 40] In *Espinoza v. State*, 969 P.2d 542, 544 (Wyo.1998), we concisely described the requirements for a proper *Miranda* warning:

*Miranda* requires police to inform an accused during a custodial interrogation that 1) he has the right to remain silent, 2) that anything said may be used against him in court, 3) that he has the right to have an attorney present at questioning, and 4) that, if he cannot afford to retain an attorney, on will be appointed for him.

After weighing the evidence and testimony presented at trial, the district court found Detective Wells to be credible and accepted her testimony that she properly advised Mr. Gompf of his *Miranda* rights. We find nothing in the record which causes us pause in accepting the district court's determination. This Court consistently defers to the district court in situations such as this, where the trial court assessed the credibility of the witnesses and weighed the evidence. *Lindsay v. State*, 2005 WY 34, ¶ 20, 108 P.3d 852, 857–58 (Wyo.2005). On this record, it is clear that Detective Wells properly advised Mr. Gompf of his rights under *Miranda*.

[¶ 41] Mr. Gompf also argues that his statements to Detective Wells were involuntary and should have been suppressed. We have stated that even confessions obtained after *Miranda* warnings are subject to scrutiny for voluntariness. *Eckenrod v. State*, 2003 WY 51, ¶ 26, 67 P.3d 635, 643 (Wyo.2003). For statements to be voluntary, they must "result from 'free and deliberate choice rather than intimidation, coercion, or deception.' " *Id.* See also, *Mitchell v. State*, 982 P.2d 717, 721 (Wyo.1999). If a statement resulted from coercion, then it is inadmissible at trial for any purpose because its validity is suspect. *Id.*

[¶ 42] The ultimate issue of whether a statement was voluntary is a question of law, and our standard of review is, therefore, *de novo. Mitchell*, 982 P.2d at 721. Nevertheless, we defer to the trial court's findings of fact on the voluntariness issue and do not disturb those findings unless they are clearly erroneous. We consider the totality of the circumstances to determine if the defendant's statements were voluntary. *Id.*

[¶ 43] On appeal, Mr. Gompf suggests that his statements to Detective Wells were involuntary because he was under the influence of alcohol and marijuana at the time and was questioned during the early morning hours. He also claims that he was "herded upstairs and kept there for hours with the rest of the house's occupants, and was only 'allowed' to relieve himself when taken outdoors by one of the police."

[¶ 44] The record contradicts Mr. Gompf's contention that his statement was the product of coercion. We recently addressed a claim that the defendant's intoxication rendered his statement involuntary in *Gordon*, ¶ 15. In that case, we stated:

> [F]or intoxication to render a confession involuntary, the impairment must be so great so as to deprive an individual of a capacity to understand the meaning of his statements.... [T]he fact that he understood what he was doing, carried on a conversation and responded to questions will render the statements admissible.

*Id.*

[¶ 45] Mr. Gompf does not direct us to any evidence in the record to suggest that he was so impaired by drug or alcohol use his statements were involuntary. Furthermore, Detective Wells' testimony indicates that Mr. Gompf was lucid during the interview and offered appropriate responses to her questions. In fact, although he answered some of the detective's questions, he refused to identify his drug supplier or customers.

[¶ 46] We also reject Mr. Gompf's characterization of the atmosphere of the interview as coercive and intimidating. Detective Wells testified she and Mr. Gompf were in the room alone and he was unrestrained throughout the interview. Detective Wells characterized the interrogation as her posing questions to Mr. Gompf and he "answered if he wanted to." He took advantage of that option by refusing to identify his supplier or customers. Moreover, despite the fact the occupants were watched to ensure that no evidence was compromised, they were basically allowed to do what they pleased. Mr. Gompf apparently slept for a great deal of the time the officers searched the premises, and, when he needed to relieve himself, the officers respected his choice to go outside rather than be accompanied to the restroom by an officer.

[¶ 47] On this record, we are convinced that the totality of the circumstances support the conclusion that Mr. Gompf made the statements to Detective Wells of his own free and deliberate choice. The district court's findings were not clearly erroneous, and its

decision that Mr. Gompf's statements should not be suppressed was correct.

[¶ 48]   We affirm the district court's denial of both of Mr. Gompf's motions to suppress.