2007 WY 123

**Michael L. MARINARO, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–07–0014.**

Supreme Court of Wyoming.

Aug. 2, 2007.

Representing Appellant: Dion J. Custis of Dion J. Custis PC, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Paul S. Rehurek, Senior Assistant Attorney General. Argument by Mr. Rehurek.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] The appellant appeals his conviction for possession of marijuana with intent to deliver.[1] The issue presented is whether the district court abused its discretion or erred as a matter of law in denying the appellant's motion to suppress the evidence found in his car during a traffic stop. We affirm because the appellant voluntarily consented to the search of his car.

---

1. The appellant appeals from a "Judgment and Sentence of the Court" that was filed on November 20, 2006. The record on appeal, however, also contains an " * *Amended* * Judgment and Sentence of the Court" filed on December 8, 2006, and a " * *2nd Amended* * Judgment and Sentence of the Court" filed on February 7, 2007. In their briefs, neither party mentioned these amended documents, the continued vitality of the original judgment and sentence, or the appellant's failure to appeal from the latter documents, so we will proceed under the assumption that no issues of mootness, appealable order, or jurisdiction exists. Nevertheless, in detailing the procedural history of a case, counsel on appeal should explain such filings, rather than leaving them to our guesswork.

## FACTS

At about 1:00 p.m. on August 29, 2005, a Wyoming Highway Patrol trooper "clocked" an eastbound vehicle at 77 m.p.h. in a 75 m.p.h. zone on Interstate 80 in Laramie County, Wyoming. As the trooper turned around to pursue the vehicle, he saw it pass a semi-truck and move into the right lane without signaling the lane change. The trooper stopped the vehicle and informed the appellant, who was the driver and alone in the vehicle, that he had been stopped for speeding and for failing to signal a lane change. In response to a request that he produce his driver's license, vehicle registration, and proof of insurance, the appellant, who exhibited a high level of nervousness, handed the trooper a rental agreement, showing that the car had been rented in San Francisco and was to be dropped off at the airport in Denver.

[¶ 3] The trooper noticed a small cosmetics bag on the front seat and a black overnight bag on the back seat. The trooper asked the appellant to accompany him to his patrol car, where he explained to the appellant that he was going to write him warning tickets for the two traffic violations. He then asked the appellant for permission to ask him some questions while he wrote the tickets, to which the appellant consented. The two men then engaged in a conversation that lasted about four and one-half minutes. The trooper asked the appellant about his travel plans, to which the appellant responded that he was driving to Denver to visit friends for a few days and then he would drive back to San Francisco. They also discussed various equipment in the patrol car, the appellant's job, and the fact that the trooper's brother lived in Denver.

After issuing the warning tickets, the trooper returned the appellant's driver's license and rental agreement, and told him he could go and to "have a safe trip." The appellant then got out of the patrol car and began walking back towards his rental car. The trooper radioed for the assistance of a canine unit, and then re-approached the appellant as he reached his car. The trooper asked the appellant if he could ask him more questions, to which the appellant assented.

The trooper then asked the appellant more detailed questions about his travel plans. The appellant repeated that he was going to visit friends in Denver, but this time he told the trooper that he would be flying back to San Francisco. The trooper noticed that the appellant was tense, his face was sweating, and his hands were shaking. In response to the trooper's inquiry about these signs of nervousness, the appellant explained that they were caused by the patrol car's red lights.

The trooper then asked the appellant if there was anything in the car he should know about, such as guns, drugs, large amounts of cash, marijuana, methamphetamine, heroin, or cocaine. When the appellant denied having any such items, the trooper asked if he could search the car. The appellant consented and began opening the car's doors for the trooper. He then offered to, and did, open the trunk. The trooper observed two medium-sized cardboard boxes, taped shut, in the trunk. The appellant almost immediately admitted that the boxes contained marijuana, and he was arrested.

After waiving a preliminary hearing and being bound over to district court for trial, the appellant filed a motion to suppress all evidence stemming from the search of the rental car. At the hearing of that motion, the trooper testified to the facts set forth above, and summarized as follows the circumstances that made him suspicious of criminal activity on the appellant's part: (1) the appellant's abnormal level of nervousness did not dissipate as the traffic stop continued; (2) the one-way car rental was indicative of someone hauling drugs or other contraband when coupled with a return flight home; (3) although the appellant claimed that he had driven straight through from San Francisco to Wyoming over the preceding two days, it does not take that long to drive straight through to Wyoming; the missing time could be accounted for by the delay often experienced by drug couriers who must wait a certain amount of time after the car is rented and before the drugs are loaded into the car; (4) the appellant's luggage was on the back seat of the car and not in the trunk,

indicating the possibility that there were drugs in the trunk that the appellant did not want to expose to the senses by repeatedly opening the trunk to access his luggage; (5) the appellant's story about driving to Denver to visit friends when he had just a couple days off work did not make sense; and (6) some of the appellant's answers to questions were unresponsive or evasive.

## STANDARD OF REVIEW

[¶ 7] We set forth our standard for the review of the denial of a motion to suppress in *Campbell v. State*, 2004 WY 106, ¶ 9, 97 P.3d 781, 784 (Wyo.2004):

When this Court reviews a district court's decision on a motion to suppress evidence, we do not disturb the district court's findings on factual issues unless they are clearly erroneous. *Meek v. State*, 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo. 2002); *McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999). The evidence is viewed in the light most favorable to the district court's determination because the district court conducts the hearing on the motion to suppress and has the opportunity to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions. *Id.* "When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence." *Meek*, ¶ 8 (quoting *Frederick v. State*, 981 P.2d 494, 497 (Wyo.1999)). However, the issue of law—whether an unreasonable search or seizure has occurred in violation of constitutional rights—is reviewed *de novo*. *Damato v. State*, 2003 WY 13, ¶ 7, 64 P.3d 700, ¶ 7 (Wyo.2003). *See also Meadows v. State*, 2003 WY 37, ¶ 14, 65 P.3d 33, ¶ 14 (Wyo. 2003); *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994).

## DISCUSSION

[¶ 8] We will begin this discussion by briefly noting that the appellant has neither preserved for appeal, nor has he presented to this Court a "precise, analytically sound approach when advancing an argument to independently interpret the state constitution," so we will analyze his contentions solely under the Fourth Amendment to the United States Constitution. *See Vasquez v. State*, 990 P.2d 476, 484 (Wyo.1999). In that regard, we will further note that the United States Supreme Court held in *Muehler v. Mena*, 544 U.S. 93, 100–101, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) that, during the course of a legal detention of an individual, law enforcement officers may pose questions to that person that are unrelated to the underlying purpose of the seizure and that are not independently justified by reasonable suspicion. Following *Muehler*, the Tenth Circuit Court of Appeals recently held that suspicionless questioning of a motorist by a law enforcement officer during the course of a traffic stop regarding weapons and contraband is not a Fourth Amendment violation so long as it does not extend the duration of the traffic stop. *United States v. Stewart*, 473 F.3d 1265, 1268–69 (10th Cir.2007).

[¶ 9] Without much further ado, we will simply state that the hearing transcript and the videotape of the traffic stop establish quite clearly that (1) the appellant does not challenge the validity of the initial traffic stop; (2) the brief questioning in the patrol car did not extend the period of detention necessary to write out the warning tickets; and (3) the appellant consented to the questioning in the patrol car, he consented to the questioning after he exited the patrol car, and he consented to the search of his car.

[¶ 10] In examining the totality of the circumstances to determine whether these consents were voluntary, as we must do under *O'Boyle v. State*, 2005 WY 83, ¶ 60, 117 P.3d 401, 418 (Wyo.2005), we look at such factors as the way the requests were phrased by the officer, whether the individual was told he could refuse the request, and the presence of other coercive factors.[2] Once again, we refer to the hearing transcript and

---

**2.** When a consent to search follows an illegal detention, which was not the case here, we also look to the temporal proximity of the illegal detention, any intervening circumstances, and the purpose and flagrancy of the officer's unlawful conduct. *O'Boyle*, ¶ 61, 117 P.3d at 418; *Campbell*, ¶ 14, 97 P.3d at 785.

the videotape of the traffic stop to point out that: (1) the entire traffic stop was very brief, with the initial traffic detention lasting only about six minutes; (2) the trooper's conduct throughout was professional, courteous, and completely non-coercive; and (3) all three consents given by the appellant—to the initial questions, to the subsequent questions, and to the search—were unhesitant and immediate.

[¶ 11]   The "coercive factors" present during this traffic stop are the same "coercive factors" that are present at every traffic stop: an armed and uniformed officer, plus the flashing lights on the patrol car.  If these factors were sufficient to invalidate the voluntariness of a consent, no consent would ever be voluntary.  Neither can these factors, alone, be seen as proving that the person stopped did not feel that he was free to go.  In the present case, for instance, the appellant knew that he was free to go because the trooper had told him he could go.  His departure was not stopped by the uniform, gun, or flashing lights.  It was stopped only by his consent to a non-demanding, relatively cordial request by the trooper to ask more questions.  A reasonable person in the appellant's position at that time would have felt that he could have said "no" and proceeded on his way.[3]

[¶ 12]   Our conclusion that the evidence in this case was discovered via the voluntary consent of the appellant obviates the necessity of determining whether the trooper independently had developed sufficient reasonable suspicion of criminal activity to pursue additional questioning and eventual search of the car.

## CONCLUSION

[¶ 13]   The appellant does not contest the validity of the initial traffic stop in this case. During the brief period it took for the trooper to write out the warning tickets, the appellant consented to answering the few questions that were put to him about his travel plans.  Subsequently, after he was released to return to his car, he voluntarily consented to answering another series of questions about those travel plans, and he voluntarily consented to the search of his car.

[¶ 14]   Affirmed.

---

**3.**  It must be remembered that the subjective intent of the officer is not relevant to this inquiry.