# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 76

APRIL TERM, A.D. 2014

*June 13, 2014*

TINA D. ENGDAHL,

Appellant
(Defendant),

v.

S-13-0201

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Tina Olson, Chief Appellate Counsel; and David E. Westling, Senior Assistant Appellate Counsel. Argument presented by Mr. Westling.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; and Caitlin Young, Assistant Attorney General. Argument by Ms. Young.

*Before KITE, C.J., and HILL, BURKE, DAVIS, and FOX, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**HILL,** Justice.

[¶1]    Tina Engdahl entered a conditional *Alford* plea to one count of possession of a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(c)(ii) conditioned upon her right to appeal the district court's previous denial of her motion to suppress evidence. On appeal, Engdahl contends that she should have been permitted to leave the scene of a traffic stop when she asked to do so. She also argues that the deputy lacked reasonable suspicion to detain her and that she should have been read *Miranda* rights. We will affirm the district court.

### ISSUE

[¶2]    Engdahl presents one issue for our review:

> The trial court erred in denying Engdahl's motion to suppress evidence, as law enforcement had no reasonable, articulable suspicion on which to detain her.

### FACTS

[¶3]    On June 14, 2012, Deputy Ryan Undeberg stopped a pickup truck because it did not have license plates. The driver of the truck was unable to provide his license, registration, or proof of insurance. The driver and passenger identified themselves as Ron Harris and Tina Engdahl, respectively. After they identified themselves, the deputy radioed for more information on both individuals and learned that each had a prior drug history and that Harris's driver's license was suspended at that time.

[¶4]    The deputy then informed Harris that he would receive a citation for driving on a suspended license. The deputy asked more questions regarding the truck at which point Engdahl asked if she could leave the scene and walk to a friend's house. The deputy told her to "hang out for just a sec" as he was still determining the ownership of the truck. At that time Deputy Undeberg obtained the truck's vehicle identification number [VIN] to confirm ownership. Another officer, Corporal Randy Parker, arrived on scene and the two officers discussed the events up to that point. Deputy Undeberg asked Corporal Parker to have his drug dog sniff around the exterior of the truck while Deputy Undeberg talked to Harris. The drug dog indicated there were drugs in the vehicle. Corporal Parker then asked Engdahl if she "had any drug paraphernalia on her." She admitted that she did and handed Corporal Parker a methamphetamine pipe.

[¶5]    After handing over her methamphetamine pipe, Engdahl also placed two baggies on the hood of the car at the request of Deputy Undeberg. The deputy then asked Engdahl to remove her coat, which he searched and in which he found a large chunk of

1

suspected methamphetamine. A subsequent pat down search of Engdahl occurred and she was then placed under arrest.

[¶6] On June 14, 2012, Engdahl was formally charged with one felony count of possession of a controlled substance in an amount greater than three grams. Defense counsel filed a motion to suppress evidence on behalf of Engdahl, arguing that because Deputy Undeberg did not allow her to leave when she asked permission to do so, a *Terry* stop was transformed into a custodial interrogation which should have required the deputy to inform Engdahl of her *Miranda* rights before asking any more questions. Because Deputy Undeberg did not allow her to leave, nor did he inform her of her *Miranda* rights, Engdahl argued in her motion that her Wyoming and United States constitutional rights were violated and that the court should suppress all evidence obtained after the deputy told her to remain at the scene.

[¶7] The district court held a hearing on Engdahl's motion. After hearing testimony from both officers involved and listening to a recording from Deputy Undeberg's dashboard camera the district court denied the motion to suppress. Under the two-part *Terry* analysis the court concluded the initial stop was justified and that Deputy Undeberg's actions were reasonably related in scope to the circumstances that justified the stop in the first place. According to the district court, Engdahl was not in custody or subject to custodial interrogation when the drugs and paraphernalia were found but was being subject to general on-scene questioning that did not require *Miranda* warnings.

[¶8] Seven months after the denial of the motion to suppress Engdahl entered a conditional *Alford* plea and reserved her right to appeal the district court's denial of her motion to suppress. The court sentenced her to serve no less than two nor more than four years in prison, suspended in favor of supervised probation. This appeal followed.

## STANDARD OF REVIEW

[¶9] We review a district court's denial of a motion to suppress as follows:

> We review the district court's factual findings on a motion to suppress for clear error. We defer to those findings and view the evidence in the light most favorable to the prevailing party because the district court is in the best position to weigh the evidence, assess the credibility of witnesses, and make the necessary inferences, deductions, and conclusions. However, "we review the ultimate determination regarding the constitutionality of a particular search or seizure *de novo*." *Sen*, ¶ 25, 301 P.3d at 117 (citing *Owens*, ¶ 8, 269 P.3d at 1095). *See also Lovato v. State*, 2010 WY 38,

¶ 11, 228 P.3d 55, 57-58 (Wyo. 2010) (quoting *Yoeuth v. State*, 2009 WY 61, ¶ 16, 206 P.3d 1278, 1282 (Wyo. 2009)); *Meadows v. State*, 2003 WY 37, ¶ 23, 65 P.3d 33, 40 (Wyo. 2003) (quoting *Gehnert v. State*, 956 P.2d 359, 362 (Wyo. 1998)).

*Hunnicutt-Carter v. State*, 2013 WY 103, ¶ 20, 308 P.3d 847, 852 (Wyo. 2013); *see also Phelps v. State*, 2012 WY 87, ¶ 19, 278 P.3d 1148, 1153 (Wyo. 2012).

*Klomliam v. State,* 2014 WY 1, ¶ 14, 315 P.3d 665, 668-669 (Wyo. 2014).

## DISCUSSION

[¶10]  In her only issue on appeal, Engdahl claims that the trial court erred in denying her motion to suppress evidence because law enforcement had no reasonable, articulable suspicion on which to detain her.  She also claims that because she was illegally detained, she should have received *Miranda* warnings.

[¶11]  Our case law on search and seizure law is well settled:

> The Fourth Amendment protects individuals from unreasonable searches and seizures.  U.S. Const. amend IV.  A routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief."  *Damato v. State*, 2003 WY 13, ¶ 9, 64 P.3d 700, 704 (Wyo. 2003) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).  Because a traffic stop is more analogous to an investigative detention than a custodial arrest, the reasonableness of such stops are analyzed under the two-part test articulated in *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968):  (1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were "reasonably related in scope to the circumstances that justified the interference in the first instance."  *Damato*, ¶ 9, 64 P.3d at 705; *see also Campbell*, ¶ 11, 97 P.3d at 784; *Barch v. State*, 2004 WY 79, ¶ 8, 92 P.3d 828, 832 (Wyo. 2004).

*Garvin v. State*, 2007 WY 190, ¶ 13, 172 P.3d 725, 728-29, (Wyo. 2007).[1]

---

[1]  Engdahl also argues that art. 1, sec. 4, of the Wyoming Constitution provides **greater protection** than

[¶12] Engdahl does not challenge the appropriateness of the initial stop.[2]  Thus, our analysis focuses on the second prong of the *Terry* analysis − the reasonableness of the detention as it relates to the initial stop.  Again *Garvin* is instructive here:

> During a routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance and vehicle registration, run a computer check, and issue a citation. *Campbell*, ¶ 12, 97 P.3d at 785; *Damato*, ¶ 13, 64 P.3d at 706 (citing *Burgos-Seberos v. State*, 969 P.2d 1131, 1133 (Wyo. 1998); *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997)).  Generally, the driver must be allowed to proceed on his way without further delay once the officer determines the driver has a valid driver's license and is entitled to operate the vehicle. *Damato*, ¶ 13, 64 P.3d at 706; *see also United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997); *Barch*, ¶ 9, 92 P.3d at 832.  In the absence of consent, an officer may expand the investigative detention beyond the purpose of the initial stop only if there exists an "'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring." *Damato*, ¶ 13, 64 P.3d at 706 (quoting *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001)).  The existence of objectively reasonable suspicion of criminal activity is determined by evaluating the totality of the

the federal **constitution**.  As we stated in *Klomliam v. State*, 2014 WY 1, ¶ 17, n.1, 315 P.3d 665, 669 (Wyo. 2014):

> [This Court has] observed, however, that in assessing the reasonableness of a traffic stop and detention, there is not a significant difference between our federal and state analysis, given that under either analysis we are considering the reasonableness of the government intrusion in light of all the circumstances. *Fertig v. State*, 2006 WY 148, ¶¶ 18-19, 146 P.3d 492, 497-98 (Wyo. 2006); *see also Yoeuth v. State*, 2009 WY 61, ¶ 24, 206 P.3d 1278, 1284 (Wyo. 2009); *O'Boyle v. State*, 2005 WY 83, ¶ 50, 117 P.3d 401, 415 (Wyo. 2005).  We therefore employ these same considerations under a state constitutional analysis.

In any case, Engdahl fails to provide a "precise, analytically sound approach when advancing an argument to independently interpret the state constitution." *Vasquez v. State*, 990 P.2d 476, 484 (Wyo. 1999).

[2]  Though Engdahl does not challenge the appropriateness of the initial stop, we nevertheless note that the United States Supreme Court has held that the first *Terry* requirement is "met whenever it is lawful for police to detain an automobile **and its occupants** pending inquiry into a vehicular violation.  The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Lovato v. State,* 2012 WY 10, ¶ 10, 269 P.3d 426, 429 (citing *Arizona v. Johnson,* 555 U.S. 323, 327 (2009)) (emphasis added).

4

circumstances. *Damato*, ¶ 16, 64 P.3d at 707. The "whole picture" must be considered, "[c]ommon sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id*. (citing *Wood*, 106 F.3d at 946).

*Garvin*, ¶ 14, 172 P.3d at 729.

[¶13] Here, the officer became focused on whether or not the vehicle was stolen. After all, the original basis for the stop was the pickup truck's missing license plates and while Engdahl was able to show identification, the driver failed to produce identification, registration, or proof of ownership. Engdahl's request to walk to a friend's house came as the deputy approached the truck to inform the driver that he had a suspended license and would therefore be receiving a ticket. Engdahl argues here that the deputy only continued to detain her "because of her prior drug history" and until the canine sniff. However, our review of the record and specifically the DVD of the stop, shows that up to that point Engdahl had actively participated in answering the deputy's questions regarding the truck and its ownership. At the time she requested to leave and walk to a friend's house, the deputy had not yet confirmed the VIN number and was still in the process of confirming whether or not the truck was stolen. His actions and his denial of Engdahl's request to leave were entirely related to the scope of the stop.

[¶14] Engdahl also argues that the deputy continued to detain her until the canine sniff could occur. According to the United States Supreme Court, the Fourth Amendment does not prohibit police from using a narcotics-detection dog during a lawful traffic stop even in the complete absence of reasonable suspicion so long as the canine sweep does not extend the length of the traffic stop. *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (see *Wallace v. State*, 2009 WY 144, ¶ 10, 221 P.3d 967, 969 (Wyo. 2009)). Here, Corporal Parker arrived at the scene as a cover unit while patrolling the area and was not called for the purpose of utilizing his drug dog. He was not requested by Deputy Undeberg – Corporal Parker drove to the location of his own volition. Nevertheless, Magnum the dog sniffed around the truck during the traffic stop. Qualifying as a free air sniff and because it did not extend the length or scope of the traffic stop, the dog sniff was constitutionally permissible.

*Miranda Warnings*

[¶15] In a peripheral argument to her single issue, Engdahl argues that she should have been given *Miranda* warnings during the course of the stop because she was effectively in custody. With regard to when a suspect is subject to custodial interrogation, thus requiring *Miranda* warnings, we have said the following:

5

Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Jelle v. State*, 2005 WY 111, ¶ 14, 119 P.3d 403, 408 (Wyo. 2005). In resolving the custodial status of a suspect we consider "whether a reasonable man in [the suspect's] position would have considered himself to be in police custody." *Gompf v. State*, 2005 WY 112, ¶ 31, 120 P.3d 980, 988 (Wyo. 2005). General on-the-scene questioning as to facts surrounding a crime is not "custodial interrogation," nor are statements volunteered freely without compelling influences. *Id*. We consider the totality of the circumstances when determining whether a suspect was in custody when questioned. *Id*. Several factors are relevant to the determination:

> Among these are: (1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to those associated with a formal arrest; and (4) the duration and character of the interrogation. *See* 2 Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 6.6(c) at 527 (2nd ed. 1999); *see also Wunder* [*v. State*], 705 P.2d [333,] 335 [(Wyo. 1985)].

> *Jelle*, ¶ 14, 119 P.3d at 408.

*Nava v. State* 2010 WY 46, ¶ 10, 228 P.3d 1311, 1314 (Wyo. 2010) (citing *Barnes v. State*, 2008 WY 6, ¶ 14, 174 P.3d 732, 736-37 (Wyo. 2008)).

[¶16] We have also pointed out the following considerations as relevant in some cases:

> The nature of the interrogator, the nature of the suspect, the time and place of the interrogation, the progress of the investigation at the time of the interrogation, whether the suspect is informed that his detention would not be temporary, and the elapsed amount of time between questioning and the arrest may be important factors as well.

> *Jelle v. State*, 2005 WY 111, ¶ 14, 119 P.3d 403, 408 (Wyo. 2005).

*Nava*, ¶ 10, 228 P.3d 1314.

[¶17]  Engdahl directs this Court to *United States v. Perdue*, 8 F.3d 1455, 1463-64 (10th Cir. 1993), where the Tenth Circuit recognized a limited exception to the general rule that traffic stops do not usually implicate *Miranda* concerns because of their noncoercive and nonthreatening nature.  *Id.*, 8 F.3d at 1462.  The *Perdue* court held that police officers must advise suspects of their constitutional rights even in the context of a *Terry* stop, "if they … take highly intrusive steps to protect themselves from danger."  *Id.*, 8 F.3d at 1465.  The exception applied in *Perdue* because, as the court explained, the police forced the defendant out of his car and onto the ground at gunpoint, then questioned him with their guns drawn on him and his pregnant fiancée as police helicopters hovered above.  *Id*, 8 F.3d at 1464.  Under those circumstances the court held Perdue was in police custody because any person in his position would have felt completely at the mercy of the police. *Id.*, 8 F.3d at 1465.

[¶18]  While Engdahl does not compare the factual situation here to *Perdue*, she nevertheless argues that Corporal Parker's questions about drug paraphernalia were effectively "interrogation" and likely to elicit an incriminating response.  Engdahl does not explain or analyze this statement any further.  Accordingly, we will address her statement through our own evaluation.

[¶19]  We stated in *Nava* the following*:*

> [W]e evaluate the nature of police interrogation using an objective "reasonable man" standard.  *See supra* ¶ 10.  Thus, the subjective beliefs or feelings of neither the trooper nor the appellant are relevant to the question of whether particular interrogation was custodial.  We have said "[t]he Court has been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers and has held unanimously that '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'"  *Damato v. State*, 2003 WY 13, ¶ 10, 64 P.3d 700, 705 (Wyo. 2003) (quoting *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996)); *see also Marinaro v. State*, 2007 WY 123, ¶ 11 n.3, 163 P.3d 833, 836 n.3 (Wyo. 2007).

*Id.*, ¶ 11, 228 P.3d at 1314-1315.  We also noted in *Nava* that our own precedent is instructive in showing what type of questioning is, or is not, custodial in nature, taking

into consideration the factors we mentioned above. See *Jelle*, *supra*. Keeping all of that in mind and applying it to the facts in this case we cannot conclude that Engdahl was in custody for *Miranda* purposes.

[¶20] Engdahl was originally and lawfully detained due to a valid traffic stop. Corporal Randy Parker asked Engdahl only one direct question during a completely legitimate traffic stop and the question only came after the drug dog had already alerted. She was not restrained physically and was told simply to "hang out for just a sec" after she asked to walk to a friend's house. Unlike in *Damato v. State*, 2003 WY 13, 64 P.3d 700 (Wyo. 2003) where the deputy retained Mr. Damato's license and registration, there were no documents retained by the deputy (because there were none produced by Engdahl or the driver). *Id.*, ¶ 9, 64 P.3d 704-05. Deputy Undeberg was attempting to verify the VIN on the vehicle to ensure it was not stolen given that it lacked license plates and its driver had no identification, registration, proof of insurance, or a bill of sale. The duration of the detention was relatively short, coming in at approximately nine minutes, and the officers' questions were strictly related to the purpose of the stop. Neither officer brandished their weapon. They were only two – there was no mass police presence. Finally, although the officer had not yet stated that Engdahl was "free to leave" and had asked her to "hang out for a sec" in response to her asking if she could walk to a friend's house, the officer's investigation was not completed. She knew he was trying to determine to whom the vehicle belonged and he was doing so in an expedient manner. Although she was officially seized as the passenger of the pickup truck during the traffic stop, Engdahl was not in custody such that she was subject to a custodial interrogation.

[¶21] Considering the totality of the circumstances in this instance, Engdahl was not entitled to receive *Miranda* rights.

## CONCLUSION

[¶22] We affirm the district court's order denying Engdahl's motion to suppress the evidence produced during the stop.