154 P.3d 974 (2007)
2007 WY 51
Jeremy FENTON, Appellant (Defendant),
v.
The STATE of Wyoming, Appellee (Plaintiff).
No. 05-224.
Supreme Court of Wyoming.
March 23, 2007.
*975 Representing Appellant: Kenneth M. Koski, State Public Defender; and Donna D. Domonkos, Appellate Counsel. Argument by Ms. Domonkos.
Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Eric A. Johnson, Director, Prosecution Assistance Program; and Geoffrey L. Gunnerson, Student Director, Prosecution Assistance Program. Argument by Mr. Gunnerson.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
HILL, Justice.
[¶ 1] Appellant, Jeremy Fenton (Fenton), entered a conditional plea of guilty to possession of methamphetamine with intent to deliver. The "condition" preserved Fenton's right to appeal the district court's decision to deny his motion to suppress the evidence which supported the charge to which he pled guilty. Fenton asserts that the disputed evidence was obtained during an extensive search of his home, without the benefit of a search warrant issued by a judicial officer. Thus, he contends that the search was unreasonable under the Fourth Amendment to the United States Constitution, as well as Wyo. Const. art. 1, § 4. Fenton then concludes that the district court erred in denying his motion to suppress evidence found during the unreasonable search, as well as the evidence gathered thereafter (fruit of the search), including incriminating statements he made at the time of his arrest. We will reverse and remand with instructions that the district court enter an order granting Fenton's motion to suppress.

BURDEN OF PROOF BELOW
[¶ 2] That the State bears the burden of proof with respect to justifying warrantless searches and seizures of a dwelling house is a well-established rule:
The United States Constitution and the Wyoming Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Wyo. Const. art. 1, § 4. We have stated that under both constitutions, warrantless searches and seizures are per se unreasonable unless they are justified by probable cause and established exceptions. Morris v. State, 908 P.2d 931, 935 (Wyo.1995). In addition to the consent exception to the warrant requirement, these specific exigent circumstances exceptions include:
search of an arrested suspect and the area within his control;
search conducted while in pursuit of a fleeing suspect;
search and/or seizure to prevent the imminent destruction of evidence;
search and/or seizure of an automobile upon probable cause;
search which results when an object is inadvertently in the plain view of police officers while they are where they have a right to be; and
search which results from an entry into a dwelling in order to prevent loss of life or property.

Hughes[v. State, 2003 WY 35, 65 P.3d 378 (Wyo. 2003)], ¶ 11 (citing Andrews v. State, 2002 WY 28, ¶ 18, 40 P.3d 708, ¶ 18 (Wyo. 2002)). The existence of exigent circumstances is dependent upon all of the facts or circumstances viewed in their entirety. Hughes, ¶ 13. When a proper objection or motion is made by a defendant, the State bears the burden of proving that one of *976 these exceptions applies. Mickelson v. State, 906 P.2d 1020, 1022 (Wyo.1995); Dickeson v. State, 843 P.2d 606, 610 (Wyo. 1992).
Peña v. State, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004) (the affirmance in the Peña case relied on the "emergency assistance exception," as well as an exception that is designed to prevent loss of life or property); also see Guerra v. State, 897 P.2d 447, 452 (Wyo.1995).
[¶ 3] In this instance, the district court conducted a hearing and took evidence concerning the search and seizure at issue: "In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. . . . We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess `the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions.'" Peña ¶ 25, 98 P.3d at 869.
[¶ 4] We add the following because we wish to make clear that the issue presented in a case such as this is one of the most important known to Anglo-American jurisprudence:
The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. It provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
"It is axiomatic that the `physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" State v. Straub, 749 N.E.2d 593, 597 (Ind.Ct.App.2001) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "[A] home is entitled to special dignity and special sanctity and . . . the proper way to search a home is to obtain a search warrant." Brown v. State, 738 P.2d 1092, 1094 (Wyo.1987). Thus, searches and seizures inside a home without a warrant are presumptively unreasonable, but there are a few "well-delineated exceptions to the warrant requirement." Vassar v. State, 2004 WY 125, ¶ 19, 99 P.3d 987, 995 (Wyo.2004). Consent and the existence of exigent circumstances are two of the exceptions to the warrant requirement." Pena v. State, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004); Meadows v. State, 2003 WY 37, ¶ 24, 65 P.3d 33, 40 (Wyo. 2003).
Gompf v. State, 2005 WY 112, ¶ 17, 120 P.3d 980, 985 (Wyo.2005); Rideout v. State, 2005 WY 141, ¶ 16, 122 P.3d 201, 205 (Wyo.2005). Both the Gompf case and the Rideout case are instructive here, because in those cases, once the police felt they had probable cause to search, they secured the premises to be searched and sought judicially supervised search warrants (or as in Rideout written consent of the home owner).

STANDARD OF REVIEW
[¶ 5] The constitutionality of a particular search or seizure is a question of law that we review de novo. Peña ¶ 25, 98 P.3d at 869.

FACTS AND PROCEEDINGS
[¶ 6] The following affidavit of probable cause, dated February 9, 2005, was submitted to the circuit court in support of a warrant for Fenton's arrest by Laramie County Deputy Sheriff Bruce Dexter:
On February 9, 2005 at approximately 12:05 PM Deputy Bruce Dexter and Deputy Craig Harvey went to Lisa Brown's home, 300 East Prosser, Space 152. Deputy Dexter needed to talk to Lisa Brown and Jeremy Fenton about a stolen car case he is investigating and they are suspects. Lisa Brown answered the door and let the deputies into her trailer. Jeremy Fenton was also at the residence. Deputy Harvey saw in plain view sitting on top of stereo speakers in the living room a small plastic baggie containing marijuana and marijuana *977 residue on a piece of paper. Deputy Harvey took that as evidence. Deputy Dexter found papers from Lowes that had burnt and unburnt marijuana laying on a shelf of the coffee table in the living room. Deputies searched the residence for other evidence. There was a Brinks Home Security lock box sitting on the floor between the kitchen area and living room area. Initially Fenton and Brown said the lock box belonged to Lisa Brown's brother, Chad Brown and they did not have a key for it. Deputy Hollenbach responded to help us at the trailer. Hollenbach found a key among a set of keys that Brown and Fenton said belonged to them. The key opened the box. Inside the box was $1030 in cash in a black leather wallet that contained the Wyoming driver's license and Social Security card for Jeremy Fenton. There was a plastic baggie that contained numerous small baggies, 1 Gram Precision Pocket Tech electronic scale, 1 gray plastic cigarette box that contained 2 plastic baggies of crystal methamphetamine. One baggie contained approximately 5.5 grams of methamphetamine and 1 baggie contained approximately 3 grams of methamphetamine. Both tested presumptive positive for methamphetamine.
Jeremy Fenton admitted the money was his rent money and they had to lock the money in the box because they had a problem with people stealing property from the residence.
During the booking process Fenton admitted he knew the methamphetamine was in the lockbox and he told a friend he did not want the "stuff" there because he did not want to get into trouble for it.
[¶ 7] Fenton filed his motion to suppress on May 10, 2005. A memorandum of law in support of the motion to suppress was entered in the district court record on May 16, 2005. In it, Fenton did not contest the seizure of evidence found in plain view. On May 16, 2005, the State filed a response to the motion to suppress. In it, the State asserted that the officers were within the bounds of the law in seizing evidence that was in plain view. Relying principally on Andrews v. State, 2002 WY 28, 40 P.3d 708 (Wyo.2002), the State contended that Fenton was required to assert a possessory interest in the lock box where the methamphetamine was found before he could complain of the search, and furthermore that he lacked standing to complain of the constitutionality of the search. The State then conceded that both Brown and Fenton objected to the further search of their home, but that exigent circumstances required the police to proceed with the search.
[¶ 8] At a hearing held on May 16, 2005, the district court heard evidence concerning the motion to suppress. The State called two witnesses in support of its burden to establish the reasonableness of the contested search and seizure. The first to testify was Deputy Sheriff Bruce Dexter. His testimony established that Fenton and Lisa Brown were suspected of stealing a car. Deputy Dexter talked with Brown via telephone on February 8, 2005, and he told her he would "be getting with her the next day."
[¶ 9] Deputy Dexter and Deputy Craig Harvey arrived at the trailer that was the home of Fenton and Brown shortly after Noon on February 9, 2005. Brown invited the deputies into her home and about that same time Fenton came into the living room area from another part of the trailer. As he entered the trailer, Deputy Harvey noticed a "little bit" of marijuana resting on a "piece of paper" on top of a stereo speaker. The "piece of paper" turned out to be a copy of some of the papers Deputy Dexter already had that related to the auto theft investigation. Both that "piece of paper" and the marijuana were seized as evidence that was in plain view. Brown said the marijuana was hers. Deputy Dexter then continued to look around the living room and on a shelf "underneath the top of the coffee table" he saw what looked like a little bit of marijuana. That was also seized as evidence. Brown took responsibility for that marijuana as well.
[¶ 10] At that point Dexter informed Brown he "was going to look around the rest of the trailer, that this marijuana I had found gave me probable cause to do so. So I started looking. I walked into the kitchen area. There was a big old green Army kind of duffel bag sitting on top of the counter." *978 Dexter then walked around to the other side of the kitchen counter (the counter divided the kitchen and the living room) and looked further into the kitchen. There he found a "handheld police scanner" and a plastic baggie with about a gram of marijuana in it. Deputy Dexter grabbed the closed duffel bag and "jostled it a bit, and it sounded like it was full of glass." In fact it was full of glass, and Brown told the deputies that the duffel bag belonged to her father but the glass contents belonged to a girl they had recently kicked out of the apartment because they suspected she was using drugs.
[¶ 11] Deputy Dexter "continued to look around in the trailer." He noticed a black "Brinks home security lockbox" sitting on the floor right at the end of the counter. Dexter testified that the lockbox aroused his suspicions because it "would be a good place to store drugs, money. I'd already found some marijuana in there." In answer to an inquiry who owned the box, Brown said it belonged to her brother, Chad Brown. Brown denied having a key for the lockbox and, although Fenton himself didn't speak during this interlude, Dexter assumed she was speaking for both of them. Dexter also found some keys on the kitchen counter and Brown said they were hers. Dexter tried a couple of the keys on the lockbox but was unable to open it.
[¶ 12] At about this time a third Deputy arrived, Deputy Hollenbach. He was in the area and apparently heard radio traffic and decided to come over and help out. As Deputy Dexter was in the process of writing a citation to Brown because of the marijuana, Deputy Hollenbach began checking the keys and eventually was able to open the lockbox. Inside the lockbox, the deputies found a man's wallet and it contained Fenton's driver's license, social security card, and $1,030.00 in cash. They also found glass pipes that appeared to have methamphetamine residue, a container with two baggies of methamphetamine that totaled 8.5 grams in weight, additional packaging material (baggies) similar to those that contained the marijuana found earlier, and a small scale used for weighing out drugs. Once the lockbox had been opened, Fenton answered some questions. He stated that the money was their "rent money," and that it was in the lockbox because they had a problem with people who stayed with them, or who were invited over, stealing from them.
[¶ 13] Fenton was arrested and given Miranda warnings. He was then taken to jail where, with respect to the methamphetamine, he acknowledged; "I knew it was in there, I was trying to get rid of it. I didn't want to get in there." According to Dexter's testimony, Fenton also told the police at that point that he was on probation for a prior drug charge and that he had had a positive urinalysis test for methamphetamine. Fenton made no statement as to ownership of the lockbox. It was only Brown who stated that it belonged to her brother. However, Fenton did not disagree with Brown's statement that it belonged to her brother and he never claimed it as his own. It is evident from the testimony that the deputies treated this as tacit agreement that the security box was not Fenton's. Deputy Dexter also testified that the trailer was the home of both Brown and Fenton. We also take note at this juncture that the facts relied upon at the suppression hearing were that it was the home of both Fenton and Brown. Deputy Dexter's testimony also established that Deputy Harvey largely stayed near the front door and did the bagging of evidence, while he and Deputy Hollenbach searched the trailer. Dexter also walked "to the west end of the trailer through the kitchen area back to the bedroom, looked around."
[¶ 14] During cross-examination this exchange took place concerning the search of the living room:
Q. Okay. And you decideat that point does it go through your mind that you better start searching other places in the room that maybe these people have drugs?
A. Yes.
Q. And you think, well, boy, I better start looking around in here?
A. Yes.
Q. Okay. So you bend down and look at the coffee table at that point?
A. That's exactly what I did.

*979 Q. Okay. And how far do you have to bend down to look under that coffee table?
A. A foot and a half, two feet.
Q. Okay.
A. It was enough when I bent over.
Q. Okay. You didn't have to get on your knees?
A. No.
Q. But you had to bend over, and you were probably touching your knees when you were looking?
A. Close to it. I don't know if I was touching my knees but I was bent over pretty good.
[¶ 15] Dexter conceded that he pulled out the remainder of the items under the coffee table to "see if there was anything else," and that he looked "all over the living room and the kitchen area," as well as behind the couch. Dexter also conceded that since he had found drugs in the living room he thought he should search further, including the kitchen and under the kitchen sink. The duffel bag was found in the kitchen (although its contents were not visible). He also found another baggie of marijuana there, items that were not visible from the front door or living room. Dexter continued his general search of the remainder of the house, including the bedroom (where he found a bong and a propane torch inside a closed cabinet). He looked in, around, and under clothing in the bedroom and generally searched the bedroom (including "maybe" looking under the mattress which was on the floor), taking as evidence a radio shack book, but leaving behind a second police frequency radio. Later he found yet another larger police frequency scanner behind the couch in the living room which he did not take into evidence. The scanner could be seen from the kitchen area by someone looking out into the living room area.
[¶ 16] Deputy Harvey also testified. His testimony repeated much of what Deputy Dexter had to say, but added a few additional insights to the search and seizure process at issue here. For instance, he related that Brown became upset when Harvey found the first evidence of marijuana, "she became upset that we needed a warrant to search." Deputy Dexter explained to Ms. Brown that this was "in plain view, we had probable cause to search further." Deputy Harvey also testified that Fenton admitted the methamphetamine was his, which is somewhat different, and perhaps contradictory of Deputy Dexter's testimony.
[¶ 17] Although the next two observations are only of tangential importance to the resolution of this case, we deem them of enough significance to briefly outline them. It is clear from the transcript that the time allowed for this hearing was limited. Apparently the defense attorney had indicated the hearing wouldn't take more than "half an hour," and the district court was concerned because ". . . we have people waiting back in here . . ." Defense counsel's cross examination of Deputy Dexter was fairly thorough. She did cease her questioning immediately after she was interrupted by the district court, but she also indicated she was done with her cross-examination. Before beginning a much briefer cross-examination of Deputy Harvey, defense counsel looked to the district court for guidance asking, "Do you want me to go ahead? I mean, it is already 4:25." The district court indicated defense counsel should proceed, but only a few questions were asked. Second, we note that both defense counsel and the prosecutor indicated to the district court that they were not very well prepared for the hearing.
[¶ 18] In an "Order Denying Motion to Suppress," the district court made these findings based on the information gathered at the hearing:
In Laramie County District Court Docket 27-672, the Defendant's Judgment and Sentence, filed October 31, 2003, placed him on probation after he pled guilty to the possession of methamphetamine with intent to deliver in violation of Wyo. Stat. § 31-7-1031(a)(i)[XX-X-XXXX(a)(i)] ([Lexis-Nexis] 2002). The fifth term of Defendant's probation stated that he was not to "use or possess alcohol, drugs or controlled substances or associate with those who do and shall, upon the request of law enforcement officers or probation officers submit *980 to all tests and searches relative to the use thereof."[1]
On February 9, 2005, Laramie County Sheriff's Deputies Bruce Dexter and Craig Harvey were investigating a stolen vehicle report. The deputies thought that the Defendant and his girlfriend, Lisa Brown, may have had some knowledge on the subject. The deputies went to Brown and Defendant's mobile home and knocked on the door. Brown allowed the deputies into their home. As they were discussing the theft in the Defendant's living room, Deputy Harvey noticed that there was marijuana lying on top of [a] stereo speaker in plain view. Deputy Harvey confiscated the marijuana. Ms. Brown claimed that the marijuana was hers.
On the floor below the kitchen counter, in plain view from the living room, there was a small security lockbox. The deputies asked Brown and the Defendant, who owned the lockbox, but both denied ownership claiming that it belonged to Brown's brother. On the counter, Deputy Hollenbach found a set of keys which Brown claimed as her own. Deputy Harvey then opened the lockbox using one of the keys on the key ring and discovered Defendant's wallet in the lockbox, along with approximately $1030 in cash, 8 grams of methamphetamine, a digital scale, packaging materials as are commonly used in the distribution of methamphetamine, and assorted drug-related paraphernalia. Defendant was then placed under arrest and advised of his Miranda rights. When questioned later, the Defendant continued to claim that the lockbox belonged to Brown's brother but admitted that he knew the box contained methamphetamine and admitted that he was on probation for a prior drug charge.

DISCUSSION:
The Fourth Amendment to the United States Constitution and Article 1, Section 4 of the Wyoming Constitution prohibit unreasonable searches and seizures. Burgos-Seberos v. State, 969 P.2d 1131, 1133 (Wyo.1998). Generally, reasonableness is determined by balancing the public's interest and the individual's right to personal security free from arbitrary interference by law enforcement officers. Damato v. State, 64 P.3d 700, 704 (Wyo.2003). Any analysis of the "reasonableness" of the seizure of the methamphetamine must take into account the probationary status of the Defendant and the specific terms contained in the order placing him on probation as well as his denial of ownership of the lock-box.
As might be expected, probationers do not enjoy the full panoply of rights which the U.S. and Wyoming Constitutions afford an ordinary citizen who is not on probation. Although a probationer is entitled to Fourth Amendment protection, a probationer does not enjoy the absolute liberty to which every citizen is entitled, but only a conditional liberty depending on special probation restrictions. Id. [Jones v. State, 2002 WY 35, 41 P.3d 1247 (2002)] at 1257. Unlike an ordinary citizen, a warrantless search of a probationer's residence without probable cause or exigent circumstances, does not necessarily violate Fourth Amendment as long as "reasonable grounds" for such a search exist. Id.

In Jones v. State, the Wyoming Supreme Court recognized the validity of a condition of probation requiring the probationer to submit to searches upon demand by law enforcement. 41 P.3d at 1258. In Jones, the Court stated:
We hold that in cases where the unlawful possession, consumption, or abuse of alcohol or a controlled substance was an element or contributing factor in the underlying crime, or where the evidence at sentencing suggests that the unlawful possession, consumption or abuse of alcohol or a controlled substance will likely affect a defendant's rehabilitation and *981 the prospect of future criminal conduct, reasonable grounds exist to include as a probationary condition random searches of the defendant, his residence and his vehicle for the presence of the offending substances.

Id. at 1258. However, Jones also provides that in order for the warrantless search provision to be constitutional, it must also be reasonable. Id.

Nixon v. State, 18 P.3d 631 (Wyo.2001) holds a warrantless search of a probationer's home must be based upon a reasonable suspicion that the defendant was engaged in unlawful activity. Nixon, 18 P.3d at 636. The officer "must be able to point to specific and articulable facts that, taken together with rational inference from those facts, reasonably warrant a belief . . . that a condition of parole has been or is being violated." Id.

The Court finds that the deputies were legally upon the premises, that they had reasonable cause to believe that the Defendant was violating at least one of the terms of his probation and that as a result the Defendant was obliged to submit to searches relative to his use of drugs.
There is an alternative theory upon which the Court may rely in determining whether the motion should be granted. In order to object to the legality of the search the Defendant must have an expectation of privacy in the item searched. Andrews v. State, 40 P.3d 708, 712-13 (Wyo.2002). A defendant has no expectation of privacy in an object searched if he "abandons" the object searched. Id. at 713. See also United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir.1997). Consequently, the Defendant lacks standing to complain of an illegal search or seizure of property which he has abandoned or of which he has disclaimed ownership. Garzon, 119 F.3d at 1449. A person abandons an object when he explicitly disclaims an interest in the object. Id. at 1452. Given that both Brown and the Defendant affirmatively asserted that the lockbox, which was in plain view to the officers legally on the premises, belonged to a third party, the Defendant has no expectation of privacy in the box and as a result the Defendant has no standing to object to the legality of the search of the lockbox.

CONCLUSION:
In conclusion, the Court finds that the warrantless search of Defendant's residence was proper for several reasons. The deputies were legally on the premises based on the fact that Brown let them into the house. After the deputies saw the marijuana in plain view, they had reasonable suspicion to believe that the Defendant/probationer was committing a drug crime or at a minimum associating with someone who was in possession of drugs which was also prohibited by the probationer's judgment and sentence. Defendant was required by the conditions of his probation to submit to random searches by law enforcement relative to the use of drugs or alcohol. Secondly, because both the Defendant and Ms. Brown denied ownership of the lockbox and asserted that the box belonged to a third person, the Defendant has no standing to object to the legality of the seizure and search of the lockbox. Therefore, the Court finds that no Fourth Amendment violation transpired.

DISCUSSION
[¶ 19] Our analysis will be brief because there is not much to be said about the issues raised. We conclude that the resolution of this case has nothing to do with the law that relates to searches and seizures conducted pursuant to the terms of a probation/parole agreement. That was not an issue even broached during the hearing on the motion to suppress, it was not a factor in the police officer's presence at the Fenton/Brown home, and the police officers were not aware that Fenton was on probationalthough discovery of that information was only a phone or radio call away. The district court erred as a matter of law to the extent it relied upon the terms of the probation agreement in denying the motion to suppress. See People v. Sanders, 31 Cal.4th 318, 2 Cal.Rptr.3d 630, 73 P.3d 496, 505 (Cal.2003).
[¶ 20] With respect to the other issues at large, we will note only that the search at *982 issue here was per se unreasonable under the governing law, as has been the case since the institution of the Constitutions we are called upon to interpret. The burden was on the State to prove by a preponderance of the evidence that there was some exception or circumstance that demonstrated that the search was not unreasonable. The State failed to meet that burden and, therefore, we are compelled to conclude that the search was unreasonable as a matter of law. The Andrews[2] case is simply not in point, and it does not support a conclusion that Fenton lacked standing to challenge the search of the contents of the Brinks Home Security lockbox. None of the other exceptions to the warrant requirement advanced by the State, as they pertain to the search of a dwelling house, are availing. Our independent review of other recognized exceptions are not called into play by the evidence brought forward by the State. We decline to dilute the governing law as it pertains to such searches by trying to contort these circumstances into a procrustean bed that will not accommodate them. The record is clear beyond cavil that the police officers did have probable cause which would have justified the issuance of a search warrant by a judicial authority, and that too was just a phone/radio call away during the early afternoon hours of February 9, 2005. See Gompf, 120 P.3d 980, and Rideout, 122 P.3d 201.

CONCLUSION
[¶ 21] We hold that the district court erred in denying Fenton's motion to suppress. The judgment and sentence of the district court is reversed, and this matter is remanded to the district court for proceedings consistent with this opinion.
NOTES
[1] We do not question the accuracy of this quotation from Fenton's probation agreement. However, it would have been better practice, certainly, for a copy of that agreement to have been included in the record by the prosecution or the district court. See Wayt v. State, 912 P.2d 1106, 1109 (Wyo.1996) ("Wayt is chargeable with the knowledge that a court may take judicial notice of its own records in cases closely related to the one before it.").
[2] In Andrews the search involved property belonging to Andrews, but which was located in his parents' house. Andrews agreed to allow a search of two duffel bags, but denied that a third duffel bag was his. His parents consented to the search of the third bag, and we held that he lacked standing to challenge the search. Andrews, ¶¶ 7-28, 40 P.3d at 710-14.