2008 WY 63

**Sherri R. SPETEN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0253.

Supreme Court of Wyoming.

June 9, 2008.

Representing Appellant: John Craig Abraham of Plains Law Offices, LLP, Gillette, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Teresa R. Nelson, Assistant Attorney General. Argument by Ms. Nelson.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1]   This is an appeal from the district court's denial of a motion to suppress as evidence methamphetamine discovered during a warrantless search of the appellant's purse.   The appellant entered a conditional plea of *nolo contendere* to possession of methamphetamine with the intent to deliver, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(i) (LexisNexis 2007), reserving her right to appeal that denial.   *See* W.R.Cr.P.

11(a)(2).   We conclude that the search of the appellant's purse violated neither the Fourth Amendment to the United States Constitution nor Article 1, Section 4 of the Wyoming Constitution.   Therefore, we affirm.

## ISSUE

[¶ 2]   Whether the district court abused its discretion in denying the appellant's motion to suppress?

## STANDARD OF REVIEW

[¶ 3]   A succinct statement of our standard for reviewing the denial of a motion to suppress evidence is found in *Flood v. State*, 2007 WY 167, ¶ 10, 169 P.3d 538, 542 (Wyo.2007) (quoting *O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo.2005)):

Factual findings made by a trial court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous.   *Meek v. State*, 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo.2002).   Because the trial court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination.   *Id.* Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed *de novo.   Vasquez v. State*, 990 P.2d 476, 480 (Wyo.1999).

[¶ 4]   The issue of the constitutionality of a search often focuses upon the question of whether or not the officer had probable cause to search, or the question of whether the officer had reasonable suspicion to initiate an investigative detention.   These questions are resolved by resort to an objective test, taking into account the totality of the circumstances, rather than by analyzing the subjective thought process of the officer.   *Fertig v. State*, 2006 WY 148, ¶ 25, 146 P.3d 492, 500 (Wyo.2006) (probable cause); *Meadows v. State*, 2003 WY 37, ¶ 17, 65 P.3d 33, 37 (Wyo.2003) (investigative detention).[1] Probable cause to search exists "where the

1.   Probable cause for an arrest is also reviewed under an objective standard.   *Goettl v. State*, 842

P.2d 549, 552 (Wyo.1992).

known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Damato v. State*, 2003 WY 13, ¶ 17, 64 P.3d 700, 707 (Wyo. 2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996)). By contrast, reasonable suspicion is simply " 'a particularized and objective basis' for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Finally, while the test is objective, the officer's training, experience, and expertise are to be considered as part of the "totality of the circumstances." *McKenney v. State*, 2007 WY 129, ¶ 11, 165 P.3d 96, 98–99 (Wyo.2007); *Rohda v. State*, 2006 WY 120, ¶ 24, 142 P.3d 1155, 1167 (Wyo.2006); *Vassar v. State*, 2004 WY 125, ¶ 18 n. 7, 99 P.3d 987, 994 n. 7 (Wyo.2004).

## FACTS

[¶ 5] The motion to suppress was heard on May 4, 2007. The only person to testify was Sheriff's Deputy Tony Seeman, a fourteen-year veteran of the Campbell County Sheriff's Office, with over four years served as a plain-clothed narcotics officer. Before we discuss the district court's findings of fact, we will summarize the key facts of this case, drawn from Deputy Seeman's testimony.

[¶ 6] During the evening of September 23, 2006, Deputy Seeman received a telephone call from his partner, asking him to go to the sheriff's department to assist with the execution of an arrest warrant and a search warrant. Upon arrival at the department, Deputy Seeman learned that the warrants were being requested because a woman who we will identify as J.K. had been hospitalized after receiving an injection of methamphetamine from Dickie Fay Sandy. Deputy Seeman was familiar with both J.K. and Sandy, having previously learned from J.K. that Sandy distributed methamphetamine from his automotive shop, where he sometimes hid

drugs in engine blocks. Deputy Seeman further learned from other deputies that the current situation had arisen when J.K. became seriously ill after receiving the methamphetamine injection from Sandy, was later found unconscious at her residence, and had been taken by city police officers to the hospital.

[¶ 7] Deputy Seeman was ordered to go to the location of Sandy's shop for surveillance purposes until the warrants could be obtained. Upon arrival at the shop, Deputy Seeman observed a vehicle he knew to be driven by Sandy, and he saw that the shop lights were lit. When Deputy Seeman notified the other officers that he believed Sandy was present, he was told to maintain surveillance pending completion of the warrants, but to effectuate a "probable cause arrest" if Sandy began to leave.

[¶ 8] Deputy Seeman began surveillance at about 8:50 p.m. Nothing occurred until about 9:22 p.m., when a man and a woman left the shop and walked toward Sandy's vehicle. Deputy Seeman watched the man appear to wipe off the vehicle's tires, while the woman paced back and forth.[2] Deputy Seeman recognized the man as Sandy, but did not recognize the woman. As Sandy walked around his vehicle, he came to a spot where he had a direct view of where Deputy Seeman was sitting. Fearful that Sandy would see him and would attempt to leave or go back into the building, Deputy Seeman called a nearby backup officer, and the two of them proceeded to arrest Sandy.

[¶ 9] The two deputies rapidly approached Sandy and the woman and, at gunpoint, ordered Sandy to the ground, at the same time ordering the woman to put her hands in the air and not to move. Deputy Seeman testified that it is standard operating procedure to make felony drug arrests at gunpoint because it is common for drug dealers to carry weapons. After Sandy was handcuffed and placed in the backup officer's patrol car for transport to the detention center, Deputy Seeman returned to where the woman was standing and began to question

---

**2.** In commenting upon the woman's pacing, Deputy Seeman testified that "it was kind of brisk that night."

her as to her reason for being there. The woman, later to become the appellant herein, identified herself by name, but indicated that she did not know where her "I.D." was.[3] This caused Deputy Seeman some concern because he did not know exactly with whom he was dealing. In response to the deputy's question as to her purpose there, the appellant said that she had just arrived and that she was looking for a vehicle to buy. Deputy Seeman then noted that the appellant's vehicle, which he had not noticed earlier, was not parked in front of the shop, but was parked in a line of cars that "appeared to either be abandoned or for sale or just kind of parked off to the side."

[¶ 10] Deputy Seeman told the appellant that he had been there for some time, that he knew she had not just arrived, and that he had not seen her look at any of the vehicles. He then suggested to her that most women carry their I.D. in their purse, and asked her if she would like to look in her purse for her I.D.[4] The appellant declined to look in her purse, but suggested that the backup officer could search her vehicle to see if her I.D. was there.

[¶ 11] Deputy Seeman continued to question the appellant, during which time she appeared nervous and fidgety, was pacing, and was "quite animated and upset that the police had come to make this arrest on Mr. Sandy ..." Deputy Seeman concluded that her actions resembled those of someone "who could possibly be under the influence of methamphetamine." When asked about methamphetamine use, the appellant admitted that she used it occasionally, and that she had smoked methamphetamine the previous day.

[¶ 12] During this interview, Deputy Seeman received a telephone call from Chris McDonald, an agent with the Wyoming Division of Criminal Investigation. McDonald told Seeman that the appellant was a known methamphetamine dealer, according to sever-

al "street level targets" who had named her as their source. By that juncture, Deputy Seeman's "overall sense of what's going on" was that the appellant was at the shop to get methamphetamine from Sandy and that she probably had already done so.

[¶ 13] What happened next is the focus of this appeal, and it is best described by Deputy Seeman's testimony:

Q What happened then?

A Detective Brent Wasson arrived on the scene. The search warrants and arrest warrants had just been in transit to the County Attorney's Office, to the—to the Judge's house, I believe. They were just being finalized, at least they were almost completed. Miss Speten stated that she wanted to leave, and before she left I took her purse, placed it on the back of my car and opened it to give it back to her, or to make sure that it was safe; that it was still in the immediate area. When I opened the purse, I immediately saw a glass methamphetamine pipe on top.

. . . .

Q What were your concerns and reasons for opening the purse?

A My concern was that I still had not properly identified Miss Speten, that she could have some type of weapon in the purse and still in the immediate area; that there was possibly narcotics that I believed could be dangerous narcotics that could be released into our community that I did not want to leave that scene.

Q And in addition to the pipe, did you find other items in the purse?

A Yes, there was [sic] some bags. I believe it was six, and I'll have to look.

Yeah, it was six separate small Ziplock bags, each containing approximately .8 grams of methamphetamine that was tested later.

[¶ 14] The district court ruled from the bench in denying the motion to suppress.

---

3. The record is not clear, but we assume that "I.D." means driver's license.

4. The record reflects that the appellant's purse was on the ground next to her, but does not clarify how or when it got there. The most logical inference from the known facts is that she placed or dropped it there upon raising her hands in the air when Sandy was arrested. Nothing in the record suggests that she actually physically possessed the purse at any time throughout her questioning by Deputy Seeman.

An Order Denying Defendant's Motion to Suppress was later entered, but rather than enumerating specific findings of fact, the Order simply incorporated by reference the court's oral pronouncements at the time the motion was denied. Consequently, we will identify the district court's apparent findings of fact by perusing the transcript from that hearing. Those apparent findings of fact are as follows:

1. The underlying situation, that being the arrest of a drug dealer, created a high degree of danger.

2. The incident occurred at night, in a commercial area.

3. The degree of danger was heightened by the fact that the arrest occurred at gunpoint.

4. The appellant lied to Deputy Seeman.

5. The appellant parked her vehicle in an odd location.

6. The fact that the appellant placed her purse on the ground heightened the curious nature of the encounter.

7. The appellant told Deputy Seeman that she was a methamphetamine user and had used the drug the previous day.

8. The appellant intended to leave and to take her purse with her.

9. The officers believed they were dealing with a contaminated drug supply.

[¶ 15] Based upon these findings of fact, the district court reached three conclusions of law:

1. Under the totality of the circumstances, Deputy Seeman had probable cause to arrest the appellant before he seized and searched her purse.

2. Seizure and search of the purse was justified by the doctrine of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. The list of exceptions to the requirement for a search warrant found in *Fenton v. State*, 2007 WY 51, 154 P.3d 974 (Wyo. 2007), is not exhaustive.

**DISCUSSION**

[¶ 16] Because the search of the appellant's purse was carried out without Deputy Seeman having obtained a warrant authorizing him to do so, we will begin this discussion with a review of the law governing warrantless searches:

The United States Constitution and the Wyoming Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Wyo. Const. art. 1, § 4. We have stated that under both constitutions, warrantless searches and seizures are per se unreasonable unless they are justified by probable cause and established exceptions. *Morris v. State*, 908 P.2d 931, 935 (Wyo.1995). In addition to the consent exception to the warrant requirement, these specific exigent circumstances exceptions include:

—search of an arrested suspect and the area within his control;

—search conducted while in pursuit of a fleeing suspect;

—search and/or seizure to prevent the imminent destruction of evidence;

—search and/or seizure of an automobile upon probable cause;

—search which results when an object is inadvertently in the plain view of police officers while they are where they have a right to be; and

—search which results from an entry into a dwelling in order to prevent loss of life or property.

*Hughes [v. State]*, [2003 WY 35,] ¶ 11, [65 P.3d 378, 382 (Wyo.2003)] (citing *Andrews v. State*, 2002 WY 28, ¶ 18, 40 P.3d 708, ¶ 18 (Wyo.2002)). The existence of exigent circumstances is dependent upon all of the facts or circumstances viewed in their entirety. *Hughes*, ¶ 13. When a proper objection or motion is made by a defendant, the State bears the burden of proving that one of these exceptions applies. *Mickelson v. State*, 906 P.2d 1020, 1022 (Wyo. 1995); *Dickeson v. State*, 843 P.2d 606, 610 (Wyo.1992).

*Peña v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004). *See also Fenton v.*

*State,* 2007 WY 51, ¶ 2, 154 P.3d 974, 975 (Wyo.2007).

[¶ 17] As the district court noted in its conclusions of law, this list is not exhaustive. We have, for example, approved the "inventory search" of an impounded vehicle without probable cause. *Vargas–Rocha v. State,* 891 P.2d 763, 767 (Wyo.1995). We have also found constitutionally reasonable a "weapons frisk" of an arrestee's companion without probable cause, for officer safety purposes. *Perry v. State,* 927 P.2d 1158, 1164 (Wyo. 1996). This has been called the "automatic companion rule." *Id.* at 1163. In *Cotton v. State,* 2005 WY 115, ¶ 22, 119 P.3d 931, 936 (Wyo.2005), we held the search of an arrestee's shirt to be reasonable under all the circumstances, even though the arrestee was not wearing the shirt at the time of the arrest. That holding, under state constitutional analysis, was based upon the officer safety concerns of both the search incident to arrest exception and the automatic companion rule, because the arrestee attempted to have his passenger retrieve the shirt from his vehicle just after being arrested and before he was escorted to the patrol car. *Id.* at ¶¶ 5, 22, 119 P.3d at 932, 936.

[¶ 18] In another line of cases, we have recognized that the "community caretaker" function of law enforcement officers may lead to encounters with citizens that, at the outset, are based upon neither probable cause nor even reasonable suspicion of criminal activity. *Wilson v. State,* 874 P.2d 215, 217 (Wyo.1994), began when a police officer saw Wilson limping badly at 12:30 a.m. The officer pulled over to determine whether Wilson was injured. Wilson was then detained while the officer ran a "warrants check" locally and with the National Crime Information Center. *Id.* Relying upon *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), we concluded that the officer's initial contact with Wilson was constitutional under the community caretaker function. *Wilson,* 874 P.2d at 221. We also concluded that the officer's request that Wilson produce identification did not convert the encounter into a seizure. *Id.* at 222. However, we held that Wilson's detention during the warrants check and the officer's subsequent directive to Wilson to wait at a particular location until the officer returned from a seemingly unrelated investigation constituted a seizure under the Fourth Amendment and were unlawful because they were not supported by reasonable suspicion of criminal activity. *Id.* at 223–25.

[¶ 19] Over the years, we have been called upon to consider the community caretaker doctrine in various circumstances. In *Morris v. State,* 908 P.2d 931, 935 (Wyo. 1995), we held that officers were justified in escorting the unsteady and disoriented Morris to the sheriff's office to enable him to call a friend for a ride, but not in searching Morris's wallet, which had been misplaced in the patrol car. In particular, we found that none of the exceptions to the requirement for a search warrant applied. *Id.* at 936–37. In a substantially dissimilar case a year later, we relied upon the community caretaker function of law enforcement to justify the continued questioning of a vehicular-homicide arrestee because of confusion over whether there had been one or two passengers in his vehicle at the time of the accident. *Bloomquist v. State,* 914 P.2d 812, 821–22 (Wyo. 1996). Finally, in *Lancaster v. State,* 2002 WY 45, ¶ 69, 43 P.3d 80, 105 (Wyo.2002), we described how a community caretaker case may become an eventual arrest:

The lesson to be learned from these cases is that resolution of a search and seizure issue in the context of an investigatory stop that becomes an arrest requires application of a totality of the circumstances test. *Martindale v. State,* 2001 WY 52, ¶ 11, 24 P.3d 1138, 1141 (Wyo. 2001); *Buckles v. State,* 998 P.2d 927, 930 (Wyo.2000). The same test must be used in cases such as *Wilson* and *Morris* and the instant case, where the initial contact with the defendant did not arise out of an investigatory stop, but was initiated out of concern for the defendant's welfare. When an officer observes conduct that suggests a person may be injured or otherwise in need of assistance, the officer's community caretaker function allows him to contact that person regardless of the lack of any articulable suspicion of criminal activity. Instead, the contact may be justified by showing the "specific and articulable

facts" upon which the officer relied in exercising his community caretaker function; that is, in acting to enhance the public safety. *Morris*, 908 P.2d at 936. Facts learned during that initial contact may lead to reasonable suspicion of criminal activity, and that reasonable suspicion may lead to further investigation and an eventual arrest.

[¶ 20] With this body of law in mind, we will now explore the various rationales that have been offered by the State in support of the constitutionality of Deputy Seeman's search of the appellant's purse. Deputy Seeman, himself, testified that he searched the purse as the appellant prepared to leave the scene (1) to make sure that it was safe; (2) because he had not properly identified the appellant; (3) because the purse could have contained a weapon; and (4) because the purse could have contained some of the suspectedly contaminated methamphetamine. *See supra* ¶ 13. In the State's opening statement at the motion hearing, the prosecutor proffered (1) "in a *Terry*-type situation there's what's called an automatic companion doctrine," (2) the community caretaker function of law enforcement; (3) the "Carroll doctrine," and (4) "if there's not probable cause to arrest this defendant at the time the search is made, it's awfully, awfully close to probable cause[.]"[5] In closing argument, the prosecutor argued (1) search incident to arrest; (2) probable cause for arrest; (3) the automatic companion rule; and (4) the community caretaker function. As noted hereinabove, the district court upheld the search on two grounds: probable cause to arrest and the *Terry* doctrine. *See supra* ¶ 15.

[¶ 21] In her appellate brief, the appellant focuses on two points: first, the search of the purse was not done pursuant to any of the recognized exceptions to the constitutional warrant requirement, and second, Deputy Seeman's actions were not reasonably related to the circumstances that justified the appellant's original detention. In response, the State contends that the search was justified under the automatic companion rule of *Perry*, or that it was reasonable under all of the circumstances. For the latter contention, the State emphasizes *Putnam v. State*, 995 P.2d 632, 637 (Wyo.2000), where we quoted the following passage from *Terry* in justification of a pat-down search for weapons during an investigative detention:

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations and footnote omitted] And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. [Citation omitted]

*Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).[6]

[¶ 22] Finally, at oral argument, counsel boiled the issue down to its essence. The appellant contended that the *Terry* reasoning dissipated after 20 minutes of questioning, meaning that the "stop and frisk" rationale no longer applied at the time of the purse search. In other words, if *Terry's* purpose is to provide for officer safety during an investigative detention, that purpose no longer existed once the detention had ended and the appellant was going to leave. The State argued, to the contrary, that the officer safe-

---

**5.** We assume that, by the "Carroll doctrine," the prosecutor was referring to the automobile exception to the warrant requirement, as recognized in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See Hunter v. State*, 704 P.2d 713, 715 (Wyo.1985); *Neilson v. State*, 599 P.2d 1326, 1337 (Wyo.1979); *State v. Munger*, 43 Wyo. 404, 408, 4 P.2d 1094, 1095 (1931). It has no application here.

**6.** It is noteworthy that neither brief in this case distinguishes well between the concepts of probable cause to arrest and reasonable suspicion to detain. That may be because, despite the arrest and detention language, the common denominator is actually the search incident thereto, which raises the similar common denominator of officer safety. The automatic companion rule allows the pat down of an arrestee's companion for officer safety reasons. *Terry* allows the pat down of a suspect during an investigative detention, also for officer safety reasons.

ty concern actually increased during the conversation, as the officer learned more about the appellant, meaning that the case fits directly under *Terry*. In pursuing this argument, the State for all intents and purposes abandoned the automatic companion argument.

[¶ 23] The State has thrown all of its stated justifications into a hypothetical funnel, with the officer safety rationale of *Terry* falling out the bottom, but if we reject that theory, we will have to decide whether any other relevant theory justified the search of appellant's purse, because we are reviewing the facts under an objective standard, and because we may affirm the district court upon any theory supported by the record. *Vigil v. State,* 2004 WY 110, ¶ 17, 98 P.3d 172, 177 (Wyo.2004); *Billingsley v. State,* 2003 WY 61, ¶ 9, 69 P.3d 390, 395 (Wyo.2003). We begin with the observation that, obviously, Deputy Seeman did not obtain a warrant to search the purse. Consequently, the search was unreasonable, and therefore, unconstitutional, unless it was justified by a recognized exception to the warrant requirement. The potential exceptions to the warrant requirement, under the circumstances of this case, are: (1) probable cause to search, with the exigency of the imminent loss or destruction of evidence; (2) probable cause to arrest the appellant, coupled with a search incident to that arrest; (3) the automatic companion doctrine; (4) the community caretaker function; and (5) the *Terry* doctrine. Given the somewhat confused and somewhat confusing arguments presented in the trial court, in the briefs, and in oral argument, we feel compelled to note that there is neither a "freestanding" right to search based solely upon officer safety concerns, nor is there a "freestanding" right to search based solely upon reasonable suspicion of the presence of weapons or contraband. The right to search or "frisk" for weapons arises out of the need for officer safety during an arrest, which arrest, whether by warrant or not, is supported by probable cause, or it arises out of the need for officer safety during an investigative detention, the latter by its required nature being based upon reasonable suspicion of criminal activity.

[¶ 24] Under *Terry* analysis, the question is this: at the time he searched the appellant's purse, did Deputy Seeman have a reasonable suspicion that the appellant was engaged in criminal activity, and if so, did the officer safety concern that engendered *Terry* justify the deputy's search of the appellant's purse 20 minutes after the encounter began, and just as it was about to end? Asked more plainly, did Deputy Seeman have the right to pick up the appellant's purse and search it before handing it to her so she could leave? We conclude that, while this was not the typical fact pattern that leads to a *Terry* "stop and frisk," Deputy Seeman did, at the time of the search, have reasonable suspicion that the appellant was engaged in criminal activity, and Deputy Seeman did, at the time of the search, have reasonable apprehension as to officer safety. An officer safety concern does not necessarily exist at only one precise moment in time during an investigative detention, and we believe the rationale of *Terry* would allow a limited search for weapons at any time during that detention that the officer safety concern becomes apparent.

[¶ 25] Viewing the evidence in the light most favorable to the State, as we must, these were the facts: (1) a known felony drug dealer had just been arrested at gunpoint; (2) the arrest occurred at night; (3) the arrest occurred at the location where the arrestee was believed to conceal and deal methamphetamine; (4) the appellant was present during, and quite agitated by, the gunpoint arrest; (5) the appellant emerged from the shop building with Sandy after being inside for about one-half hour; (6) the appellant lied to Deputy Seeman about how long she had been at the scene; (7) Deputy Seeman, an experienced law enforcement officer with considerable narcotics training, recognized the appellant's fidgeting and nervousness as characteristic of someone using methamphetamine; (8) Deputy Seeman learned during the investigative detention that the appellant was suspected to be a drug dealer, and that she was an admitted methamphetamine user; (9) the appellant's refusal to look into or open her purse was unusual; and (10) drug dealers often carry weapons. Under these circumstances, we cannot say that Deputy Seeman's safety concerns were

unreasonable. He could have searched the appellant and her purse for weapons when he arrested Sandy, under the automatic companion rule. He did not do so, however, but followed up the arrest with an investigative detention of the appellant. That is when the *Terry* doctrine "kicked in," and we believe that, under the particular circumstances of this case, the right to frisk for weapons existed when the purse search occurred. Many of the facts that justified the search were developed during the detention, and *Terry* certainly should not be read so narrowly as to allow a weapons search at the onset, or not at all.

[¶ 26] Whether raised under the Fourth Amendment to the United States Constitution, or Article 1, Section 4 of the Wyoming Constitution, the answer to the question is the same. We have used the "totality of the circumstances" approach to judging reasonableness that is required for analysis under the state constitution. We found no facts that would support a conclusion that the greater protections of Article 1, Section 4 require reversal in this case. Moreover, in her meager state constitutional analysis, the appellant has failed to provide any foothold for such a conclusion.

## CONCLUSION

[¶ 27] Having concluded that Deputy Seeman's search of the appellant's purse was constitutional as a reasonable search for weapons during an investigative detention, we need not further consider any of the other theories and justifications discussed by the parties.

[¶ 28] Affirmed.